WHITE MOUNTAIN BANK *versus* PRESBURY WEST, AND PATTEN & HAMLIN, *Trustees.*

SAME *versus* WEST & MORSE, & same *Trustees.*

JOHN M. WHIPPLE *versus* WEST, MORSE & CO., and same *Trustees.*

EBENEZER CARLETON, *pet'r., versus* WHITE MOUNTAIN BANK.

SAME *versus* JOHN M. WHIPPLE.

If one member of a firm, in purchasing property, so conducts himself as to lead the vendor to suppose that he is acting for the firm, he is thereby estopped, as against such vendor, from claiming that the sale was made to him alone.

And if the firm take the property so purchased and intermingle it with their own property of the same kind, and sell the whole together, giving no notice that one member of the firm owns any part thereof in severalty, the purchaser is liable to the firm only for the price. The member of the firm claiming exclusive title could not maintain an action in his own name alone for any part of the price; nor can his private creditors maintain a trustee process against such purchaser.

The laws of New Hampshire prohibit a mortgager of personal property, under certain penalties, from selling the same without the consent in writing of the mortgagee, indorsed upon the mortgage, and entered in the margin of the record. A mortgagee gave such consent in writing, but it was not indorsed nor entered upon the record as the statute directs; and the mortgager thereupon sold the property in this State. *It was held,* that whether such consent was sufficient to protect the mortgager from his liabilities under the statute or not, the mortgagee was thereby estopped, as against the purchaser, from setting up any claim of title.

If a factor receives goods, and makes advances upon them, to be reimbursed from the proceeds, when sold, and is then summoned as the trustee of the owner, he is not thereby divested of his right to sell the goods. The creditor, by the trustee process, is only subrogated to the rights of the debtor.

When, in a trustee process, an assignee is admitted as a party to contest the right of the plaintiff to the fund, and the alleged trustee is afterwards discharged, neither the plaintiff nor the assignee is entitled to recover costs against each other.

REPORTED by DAVIS, J., April Term, 1858.

THE trustees in this case, Messrs. Patten & Hamlin, received a quantity of lumber of West, Morse & Co., a firm doing business in the State of New Hampshire, upon which they made certain advances. For these advances they were

to be reimbursed out of the proceeds of the lumber, when it should be sold. They afterwards sold the lumber, and received therefor, over and above all expenses, about seven hundred dollars more than enough to reimburse them for their advances. This sum they held, and were ready to pay to whatever party was legally entitled to receive it.

The White Mountain Bank had certain demands against West, and certain other demands against West & Morse, a firm composed in part of the same persons as the firm of West, Morse & Co. The firm of West & Morse had existed before the firm of West, Morse & Co. was established. Suits were therefore commenced by the bank against West, and Morse & West; and Patten & Hamlin were summoned as trustees in both cases.

The partnership of West, Morse & Co., was formed in July, 1856. In the following December, West purchased a large quantity of lumber of John M. Whipple. Whipple claimed that this sale was made to the firm; and he brought an action against the firm for the price, and summoned the same persons as trustees.

Carleton had two mortgages of a part of the lumber that was sold to Patten & Hamlin. These mortgages were given long prior to the purchase of lumber by West of Whipple, and before the partnership of West, Morse & Co., was formed. The mortgages were from West alone. As the lumber, so mortgaged to Carleton, was intermixed by West, Morse & Co., with their lumber, and the whole sold together, Carleton claimed the proceeds of the whole in the hands of the trustees. He was admitted as a party in all the cases, to contest the right of the several plaintiffs to receive the fund.

*Edward Fox* and *Henry Willis*, argued for Carleton : —

1. A part of the lumber sold by the trustees was originally the property of West, and was by him mortgaged to Carleton by two mortgages of different dates, executed to secure distinct debts.

By the laws of New Hampshire, R. S., c. 132, § 8, it is

provided, that "no mortgager of personal property shall sell or pledge any such mortgaged property without the consent in writing of the mortgagee upon the back of the mortgage, and on the margin of the record thereof in the office." And section 10 imposes a penalty, for such sale, of double the value of the property so sold.

Carleton made no written consent upon the second mortgage. Nor was the consent upon the first mortgage entered in the margin of the record. West, therefore, had no authority to sell, and the title remained in Carleton.

2. West, Morse & Co., wrongfully intermixed the lumber mortgaged to Carleton with their own lumber, without the knowledge or consent of the mortgagee, so that the property could not be distinguished or separated. Carleton is, therefore, entitled to the entire proceeds of the sale of property, now in the hands of the trustees. 3 Kent's Com. 364; *Hazeltine* v. *Stockwell*, 30 Maine, 237; *Willard* v. *Rice & al.*, 11 Met. 493; *Bryant* v. *Ware*, 30 Maine, 295.

*Shepley & Dana*, argued for the White Mountain Bank, contending that the avails of the lumber sold by the trustees belonged to West alone, and that they were entitled thereto in their suit against West.

Whipple is not a party to this report, and his suit against West, Morse & Co., is not before the Court upon this hearing for adjudication. It is, therefore, entitled to no consideration.

The lumber was the property of West, and not of the firm. So all the partners testify. The fact that they had declared otherwise, and that the trustees supposed they were dealing with the firm, can make no difference.

Nor can Carleton's claim be supported. His mortgages embraced only about 160,000 feet, a small part of which was mixed with the other lumber of West. The entire quantity of lumber in the hands of West was about 500,000 feet. There was no such confusion as to change the title to any of the property. *Ryder* v. *Hathaway*, 21 Pick. 298.

And if there had been, Carleton lost his lien upon the property by consenting that the mortgager should sell it. It matters not that such consent was not in strict conformity with the statutes of New Hampshire. If the mortgager, by making the sale, subjected himself to any penalty, that did not prevent the title from passing to the purchasers. They lived in this State, and are not presumed to know the provisions of the statute in New Hampshire relating to sales of mortgaged property. They might well rely upon the written consent of Carleton which is proved in this case.

*Howard & Strout,* for Whipple.

The opinion of the Court was delivered by

DAVIS, J.— Messrs. Hamlin and Patten have been summoned as trustees, and have disclosed, in each of the above cases. Carleton claims the funds in their hands as belonging to him, and has been admitted by the Court as a party, for that purpose. The several plaintiffs have filed allegations, according to the statute; and they, and Carleton, have taken testimony to support their respective claims. The principal defendants have been defaulted.

It is said in argument that Whipple's case is not before us. And it is true that each of the three cases is distinct from the others; and Whipple is no party to either of the other actions. But the disclosure in his case is before us, with his allegations and proofs; and we are to determine the liability of the trustees in his case, as well as in the others.

It seems to be conceded, that the funds in the hands of the trustees belong either to West, individually, or to West, Morse & Co. As the second action is not against West alone, nor against the firm, the trustees, in that suit, must be discharged.

Carleton claims to hold the funds in the hands of the trustees by virtue of two mortgages held by him upon the lumber which they sold. If his claim is sustained the trustees must be discharged in both the other suits.

If Carleton's claim is not sustained, we must determine

White Mountain Bank *v.* West, and Patten & Hamlin, Trustees.

whether the lumber was the individual property of West, or the property of West, Morse & Co. If the property of the former, the trustees are liable to the White Mountain Bank; if the property of the latter, they are liable to Whipple, and therefore not liable to the bank.

Carleton had two mortgages of the same lumber, one dated Feb. 25th, and the other April 3d, 1856. On the back of the first mortgage was the following indorsement: —

"It is agreed by the parties to this mortgage, that the said West is to manufacture and sell the lumber mortgaged, at his own expense, subject only to his paying over the avails of the same to said Carleton, when sold, if done seasonably to pay the notes secured by this mortgage agreeably to their terms.                    "Ebenezer Carleton,
                    "Presbury West."

The notes secured by this mortgage became due, one of them in Oct. 1856, and the other, for $1700,00 in Oct. 1857.

The second mortgage was given to secure another note of $405,00, payable in Feb'y, 1857. And it is contended by Carleton's counsel, that as the agreement for West to sell the lumber was indorsed upon the first mortgage, it was restricted to that; and that he had no right to sell after the second mortgage was given. But we do not so understand the intention of the parties. There is no date to the agreement written on the back of the first mortgage. Nor have we any right to assume that it was of the same date as the mortgage, as it was entirely distinct from it, as much as if it had been written on a separate paper. The second mortgage does not annul it, either expressly, or by implication. It was still a valid, subsisting agreement. It referred to the same lumber described in both of the mortgages, and was a consent in writing by the mortgagee that the mortgager might sell the property. And, whether the consent was sufficient to protect the mortgager, or not, the mortgagee is thereby estopped from setting up any claim of title against the purchasers. And, having lost his title, the *mortgage* gives him no right to the proceeds.

When the lumber was delivered to Patten & Hamlin, and they had made advances upon it, with the agreement that they should sell it to reimburse themselves, they had a right so to sell it, even after trustee process was served upon them.

Neither Carleton, nor other creditors, can claim any more than to be subrogated to the rights of West.

If West had the right to sell the lumber, then he could give a good title. His stipulation, that the avails should be paid over to Carleton, was personal only; and any default on his part in this respect, could not affect the title of his vendee.

Nor did this consent for him to sell make him. an agent of Carleton for that purpose. It was a release of the mortgage claim, in case of a sale. The effect of a mortgage with such consent for the mortgager to sell, was to hold the property for the mortgagee against attaching creditors; but, from the time of sale, the lien of the mortgagee was extinguished, and the mortgagee was left with no security but the personal promise of the mortgager to pay the proceeds to him. And if he wished to reach the proceeds in the hands of the purchasers, he, like other creditors, should have resorted to a trustee process under the statute.

Carleton states in his allegations, that the property in the hands of the trustees, at the time of service upon them, belonged to him, and was the proceeds and avails of lumber belonging to him. But his claim upon the specific property cannot be sustained; for West had authority to dispose of it, as he had done. And his claim for the proceeds cannot be sustained; for a claim to "credits" can be sustained only by proof of "an assignment" from the principal debtor. Such an assignment of the sum due West from the trustees, could not be made until the contract between West and the trustees was made. That West made any such assignment to Carleton, is not pretended. His claim must therefore be dismissed.

We have alluded to the fact, stated in argument, that some of the lumber was in the hands of the trustees, unsold, at the

time of the service of the process upon them. They state in their disclosure that it had been sold, and that a specific sum was due therefor, at the time they were summoned as trustees. The parties are estopped by the statute from contradicting them. Nor is there any evidence to contradict this statement, except the deposition of one of the trustees, in Whipple's case. It there appears by the account rendered, that, if sold before they were summoned, they did not receive pay for a large part of it until afterwards. We do not think it material; though we think the case shows, on the whole, that the trustees had sold all the lumber before they were summoned, but that a part of the proceeds did not come into their hands until afterwards.

It remains for us to decide whether the trustees are liable to pay the amount in their hands to West, Morse & Co., or to West alone.

The partnership of West, Morse & Co. was formed July 27, 1856. It is evident that, at that time, the larger part of the lumber was the property of West. Nor is there any evidence that he then or afterwards sold it to the firm. Still, though the title to the property was in him, he and the other members of the firm may have so conducted towards the trustees, that, as to them, they are estopped from denying that the lumber belonged to the firm.

In December, after the partnership was formed, West bought about 75,000 feet of lumber of Whipple. And though he testifies that he bought it upon his own individual account, we are satisfied that Whipple supposed, and had good reason to suppose, that he was selling it to the firm. Their mode of doing business was such that a sale of lumber to West must have been believed to be made to the firm, unless he gave notice to the contrary. Instead of doing so, he seems to have used the terms " we" and " our" as if doing business for the firm. We have no doubt that the lumber sold by Whipple became the property of the firm. They have been defaulted in his action against them for the price. This lumber was sent to market with that which had been owned by

White Mountain Bank *v.* West, and Patten &.Hamlin, Trustees.

West alone. If not actually mingled together, no separate account was kept of it. What proportion of each was sent to the trustees it is impossible to determine. The trustees had no reason to suppose that any part of it was the individual property of West; but all their intercourse and correspondence was such as to lead them to believe that they were dealing with the firm. Especially was the conduct of West calculated to give them this impression. He gave them no notice that the lumber belonged to him. He disclosed the names of his partners, and gave the note of the firm for the money advanced in anticipation of the consignment. The lumber actually belonging to the firm was so mingled with his, that the trustees, if they had had notice, could not have distinguished the one from the other. It is very clear, that West himself is estopped from claiming that the trustees should account to him, individually; and his creditors, by a trustee process, can stand in no better position. The trustees are under no obligation to account to any one except West, Morse & Co., and to those to whom the rights of that firm have been transferred.

In both of the cases in favor of the White Mountain Bank, the trustees are discharged. And though in these cases, Carleton was admitted as a party, yet as neither party prevails in holding the funds, so neither party can recover costs against the other.

In the case of Whipple *v.* West & als., the trustees are charged for the sum of $696,19, deducting therefrom their costs in that suit. In the other suits the trustees are entitled to recover their costs. In this case the plaintiff is entitled to costs against Carleton.

TENNEY, C. J., and HATHAWAY, CUTTING, MAY and GOODE-
NOW, J. J., concurred.