## FIRST NAT. BANK & TRUST CO. OF OKLAHOMA CITY, OKL., v. STOCK YARDS LOAN CO.

### No. 9598.

Circuit Court of Appeals, Eighth Circuit.
April 26, 1933.

Rehearing Denied May 31, 1933.

W. F. Wilson, of Oklahoma City, Okl., and Henry S. Conrad, of Kansas City, Mo. (W. F. Wilson, Jr., R. E. Owens, and Wilson, Wilson & Owens, all of Oklahoma City, Okl., and Hale Houts, of Kansas City, Mo., on the brief), for appellant.

R. B. Caldwell, of Kansas City, Mo. (R. R. Brewster and McCune, Caldwell & Downing, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is an appeal from a judgment based upon a directed verdict at the close of plaintiff's case in an action at law brought by appellant, the First National Bank & Trust Company (hereafter called the bank) against the Stock Yards Loan Company (hereafter called the loan company). The action was for conversion of cattle owned by one Jesse C. Moore upon which the bank claimed liens under chattel mortgages. The complaint contained five counts. The first alleged the conversion of 400 white-faced cattle on or about April 23, 1929, in Pontotoc county, Okl.; the second alleged the conversion of 99 white-faced cattle on or about June 22, 1929, in Pontotoc county.

The chattel mortgage under which the bank claimed a lien on said cattle mentioned in counts 1 and 2 was executed by Moore October 18, 1927, and covered 1,095 white-faced cattle said to be located in Pontotoc county. This chattel mortgage was filed in Pontotoc county October 19, 1927. It was later renewed on April 10, 1929, covering 993 white-faced cattle, located in said Pontotoc county, and the mortgage was filed in said county April 16, 1929. The first chattel mortgage was thereupon released by the bank.

The third count alleged the conversion of 114 plain cattle on or about May 25, 1929, in Pontotoc county.

The fourth count alleged the conversion of 211 plain cattle on or about June 8, 1929, in the same county.

The fifth count alleged the conversion of 120 plain cattle on or about July 6, 1929, in the same county.

The chattel mortgage under which the bank claimed a lien on said plain cattle mentioned in counts 3, 4, and 5 was executed by Moore on January 23, 1929, and covered the following described cattle:

"1,139 head of 2, 3 & 4 year-old past steers, averaging in weight 700 lbs. or more at this time, being fed 4 lbs. of cake and 8 bales of hay to the hundred per day, branded '9' on the left shoulder, some horned and some dehorned, 60% to 65% reds, some red and white spotted and a few plain colors— 264 head bought on the market at Fort Worth, 243 from D. F. Lancaster and the remaining 632 from O. L. Unsell and others, value $57.50 each. * * *

"Now located on the Jesse C. Moore ranch 3 miles Northeast of Scullin, Pontotoc County, Oklahoma."

This mortgage was filed in said county January 24, 1929.

Prior to September 13, 1929, the bank received the proceeds of the sale of 407 cattle, and on that date a renewal mortgage was executed by Moore covering the following described cattle:

"(732) head of plain steers, two's and three's weighing about 700 lbs. each, branded '9' on left shoulder or thus 'R' on left side or 'O' around left hip bone. Value $43,920.00; a good grade of plain cattle, various colors, mostly reds and red and white spotted, some Jerseys and Browns on them. * * *

"Now located on the Jesse C. Moore ranch 3 miles Northeast of Scullin, Pontotoc County, Oklahoma."

This renewal mortgage was filed in said Pontotoc county September 18, 1929, and the original mortgage was thereupon released by the bank. It is to be noted that this renewal mortgage was executed after the dates of the conversions alleged in counts 3, 4, and 5.

The loan company in its answer denied the validity of the bank's chattel mortgages; denied that they covered the cattle alleged to have been converted; alleged that the bank had waived its rights under the chattel mortgages by consenting that Moore might sell the mortgaged cattle when and to whom he pleased; alleged that the cattle mentioned in the third, fourth, and fifth counts as having been converted did not come within the description contained in the chattel mortgage said to be applicable to those counts, and

were not covered by said mortgage; and alleged several other defenses.

At the close of the bank's evidence, the trial court directed a verdict in favor of the defendant loan company as to all of the counts on the ground of waiver by the bank of its mortgage rights; as to counts 3, 4, and 5 on the further ground that the chattel mortgage applicable to those counts did not by the description of the property contained therein cover the cattle alleged in those counts to have been converted.

The question of waiver by the bank of its rights relative to sale of the cattle, and the question of the description of the property contained in the chattel mortgage (Exhibit E) applicable to counts 3, 4, and 5, are the two main questions presented on this appeal.

### The Matter of Waiver.

The waiver relied upon by the loan company is one arising from the conduct of the bank relative to the handling and sale by Moore of cattle covered by the chattel mortgages held by the bank.

Each of the chattel mortgages contained the following provisions:

"It is expressly stipulated and agreed that said cattle above described shall remain and be kept upon the premises described above, or in same county separate and apart from all other cattle, until the full payment of the indebtedness hereinafter described, unless sooner marketed or removed by and with the written consent of the mortgagee or assigns.

" * * * Until the default herein, or until possession has been taken by the second party as aforesaid, or the representatives or assigns of second party as aforesaid the first party may retain possession of said property. When marketed, the written consent of the second party having been first obtained, said property shall be consigned to market, and the proceeds applied to the payment of the above mentioned indebtedness and the surplus, if any, being paid to the first party. The first party shall not sell or attempt to sell, except in conformity herewith or remove or attempt to remove, from its present location in the county aforesaid, any part of said property."

Jesse C. Moore lived at Sulphur, Okl., which is about 80 miles from Oklahoma City, where plaintiff bank was located. Scullin is 8 or 10 miles east of Sulphur. It is about a three-hour drive from Oklahoma City. Moore was the vice president of the Farmers' National Bank at Sulphur, and owned and operated cattle ranches near Scullin.

The Scullin ranch contained about 8,500 acres; the Buckhorn ranch about 3,090 acres. The Scullin ranch was divided into pastures, and was located in three counties, Johnston, Pontotoc, and Murray, which cornered on each other. Witherspoon pasture (about 2,000 acres) and South Davis pasture (1,000 to 1,200 acres) and West Pontotoc pasture (about 1,800 acres) lay wholly in Pontotoc county. House pasture, Feeding pasture, and Sheep pasture lay wholly in Murray county. Quarantine pasture (1,600 or 1,700 acres) lay about two-thirds in Murray county and one-third in Pontotoc county. There was no fence on the county line. Vail pasture lay mostly in Johnston county, but a small part lay in Murray county. West Meadow pasture, Hippo pasture (1,300 or 1,400 acres), Red Tank pasture (about 1,800 acres), Meadow pasture (about 2,500 acres), Jackson pasture (about 1,200 acres), and Lester pasture, lay wholly within Johnston county. The headquarters of the ranch were in Murray county. The Buckhorn ranch was also in Murray county.

Plaintiff bank had loaned money to Moore for a number of years prior to the transactions here in controversy.

It would seem from the testimony of witness Kimbrough, foreman for Moore at the time, that the cattle alleged in count 1 to have been covered by the chattel mortgage dated October 18, 1927, were part of a shipment of about 1,500 calves which Moore brought in from Texas. They arrived at Dougherty, Murray county, late in November, 1927, were branded, and were then taken to the Ball farm, which is also in Murray county. After Christmas, 1927, these cattle were shifted, and part of them were put in the Quarantine and Witherspoon pastures.

Moore testified: "When the mortgage dated October 18, 1927, was executed, I would not say the cattle were located in Pontotoc County. There were different shipments of those cattle and I could not say that all of those cattle were unloaded at Dougherty. If they were unloaded at Dougherty, there was not a steer in the load referred to in the mortgage in Pontotoc County at that time."

Teter, vice president of the plaintiff bank, who handled the business of Moore with the bank, and had supervision over the loans and checking the security he gave for the loans, testified:

"Q. Mr. Teter, when you took your mortgage, or took this mortgage that you took on the 15th [18th] of October, 1927, securing or purporting to secure a note for $32,850.00 you did not know whether the cattle described in that mortgage were then in Oklahoma or Texas, did you? A. No, we only knew that they were represented to us to be there and we had confidence in our customer. We could not say; no, we did not know, no.

"Q. You did not know whether Moore owned those cattle at that time, did you? A. Well, I guess not.

"Q. And you did not know where they were, did you, if he did own them? A. It should be answered by no. I don't suppose you would have personal knowledge about the—

"The Court: That is all.

"Q. And you did not know where the cattle were, did you? A. No."

That the cattle were indiscriminately shifted from one pasture to another without regard to county lines is quite apparent from the testimony.

In May, 1928, Teter made an inspection of Moore's cattle for the bank. He found 1,562 white-faced yearly steers, but none of them were in Pontotoc county. Part of them were in Johnston county and part in Murray county. He found no particular number of the cattle which could be distinguished from the others, and he made no demand on Moore that he move any of the cattle into Pontotoc county.

Witness Thompson testified that in the spring of 1928 he saw white-faced cattle in the Quarantine and Witherspoon pastures estimated by him to be about 900 in number.

In March, 1929, Teter made another inspection. At this time he found 1,704 cattle answering the description of the mortgage of October, 1927; 600 of these were in West Pontotoc pasture, 541 in Witherspoon pasture (Pontotoc county), 563 in Jackson pasture. He found nothing by which to identify the number covered by the bank's mortgage.

Thompson testified that Moore moved his cattle around more than any cattle man he ever saw, and that this was especially true in 1929, when none of the cattle stayed in one place over 60 days.

As to the method of making sales of the cattle, the evidence shows that the bank did not have any one at the ranch to check shipments as made, nor any one at the markets where the cattle were sold from time to time. The bank did not advise the commission houses through which sales were made that it held mortgages on the cattle; nor did it have its mortgages listed with the Cattle Rangers' Association whose business it was to check

the sales and see that the mortgages were protected as to the proceeds.

Teter testified that Mr. Moore "was not *supposed* to sell cattle without applying the proceeds on his indebtedness." Teter further testified:

"Q. You let him sell these cattle during all of the years, both before and after November 14th, 1928, without requiring him to get written consent, didn't you? A. Yes, sir, he sold these cattle and was supposed to send the proceeds to the Bank.

"Q. You never gave him any written consent to sell the cattle? A. No sir.

"Q. And you never objected to his selling them without written consent? A. I don't recall that we ever had occasion to complain about any shipments that he made until after this trouble arose. * * *

"Q. Now I will ask you if you testified in the Kansas case? A. Yes, sir.

"Q. Involving a controversy with Moore about those cattle and if you were asked generally about the method of sale this question: 'Q. Did Mr. Moore ask you when he could sell these cattle? A. No.' Did you say that and were you asked that question? A. Yes, sir.

"Q. The next question: 'Q. Any cattle? A. No, sir.' Were you asked that and did you say that? A. Yes, sir.

"Q. 'Q. He would sell at any time he got ready? A. Yes, sir.' You were asked that question and made that answer, didn't you? A. Yes, sir.

"Q. Then on the next page 124: 'Q. He had done that during the entire time? A. He has shipped cattle and supposed to have sent us the proceeds.' Did you make that answer to that question? A. Yes, sir.

"We did not make any objection about his shipping cattle until we found out that he breached his contract. This was early in 1930."

Moore testified that the only information the bank had as to sales was what it got from him and from the account sales; that he did not always notify the bank when he was going to ship cattle; that he shipped cattle as he got ready and notified the bank what to do with the proceeds.

Illuminating corroborative evidence is found in a letter from Teter to Moore, dated June 11, 1929, reading as follows:
"Dear Jesse:

"We received today through the First National Bank of St. Louis, deposited by Mc-Cormack-Draggon, $6,733.94, which we have credited upon your note secured by the Arkansas cattle.

"I couldn't think of any other cattle you might have that wouldn't bring more than an average of 66.82 each and that is what these cattle brought, so I took it for granted that this was the shipment from the Arkansas cattle and have credited it on that note.

"Please advise if this doesn't agree with your records."

The facts and circumstances heretofore mentioned showing the lack of care on the part of the bank relative to the location of the cattle at the time of making the chattel mortgages, relative to the movements of the cattle from county to county after the mortgages were made, relative to any segregation by the bank of the cattle covered by its mortgages from a larger number in the pastures, all tend to emphasize the same lack of care on the part of the bank relative to the sale of the cattle.

The law applicable to such a state of facts is well settled. When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives his lien, and this is true whether the purchaser knew of the existence of the chattel mortgage or not.

In the similar case of Moffett Bros. & Andrews Commission Co. v. Kent, 5 S.W.(2d) 395, 400, the Supreme Court of Missouri said:

"If a mortgagee gives his consent for the mortgagor, who under the terms of the mortgage is permitted to retain the custody, control, care, and management of the mortgaged property, to sell such property, he thereby waives his lien on the property, even though the consent was given upon the express or implied condition that the mortgagor should apply, or deliver to the mortgagee to be applied, the proceeds of the sale on the mortgage debt. A consenting by the mortgagee to a sale of the property by the mortgagor and the passing of the title and a retention by him of the mortgage lien are wholly inconsistent positions. The mortgagee cannot in effect make the mortgagor his agent to sell the property and then when a sale is effected through such agency retain his lien notwithstanding. By consenting to a sale and the collection of the proceeds by the mortgagor, the mortgagee surrenders his lien and looks to the mortgagor personally for the payment of the mortgage debt. It is so held quite uni-

versally. Stockyards National Bank v. Wool Co., 316 Mo. 426, 289 S. W. 623, and authorities cited. It is not necessary that such consent in order to constitute a waiver be expressed; it may be implied. Nor is it necessary that the vendee of the mortgagor have knowledge of such consent, or even of the existence of the mortgage. * * *

"The allowing of De Lair for years to sell cattle on which it had mortgages and collect the proceeds of such sales, without objection, tended to show that plaintiff consented for De Lair so to do. The fact that he always turned the proceeds over to plaintiff for application on the mortgage debt and had never breached the trust which it reposed in him, until the times he made sales through the defendant, was wholly irrelevant."

The same doctrine is laid down by this court in Farmers' Nat. Bank v. Mo. Livestock Commission Co., 53 F.(2d) 991. See, also, Great Northern State Bank v. Ryan (C. C. A.) 292 F. 10; White Mountain Bank v. West, 46 Me. 15.

It is contended by appellant that the doctrine of waiver is not applicable to the case at bar for several reasons: First, that the consent by the bank to sales by Moore related only to sales on regular markets. We do not think Moore's authority was so limited. The record shows no such limitation attached to the bank's consent, and the record shows sales to individuals not connected with any market. Second, that the transactions complained of were not in reality sales, but appropriations of cattle by a creditor, the loan company, after putting Moore under duress. Let us examine this contention.

The evidence shows that the loan company was a chattel mortgage creditor of Moore. One of the chattel mortgages was dated November 8, 1927, covering 1,034 coming yearling steers shipped from Texas in the fall of 1927.

Whether they were the same cattle part of which the bank claims were covered by its mortgage of October 18, 1927, may be somewhat uncertain. But the question is not of vital importance in the present controversy. This mortgage to the loan company was renewed from time to time, and other mortgages upon other cattle owned by Moore were taken by the loan company.

In April, 1929, Moore was indebted to the loan company for cattle loans in a sum exceeding $200,000. At that time the loan company learned that Moore was indebted to the bank for cattle loans which were not mentioned in the financial statement made by Moore to the loan company; in other words, that the financial statement was not true. Thereupon Freeland, secretary of the loan company, Noble, an attorney, and J. G. Callan, a cattle man, went to Sulphur to see Moore. He admitted that the financial statements to the loan company were false, and that he did not have sufficient cattle to satisfy both sets of mortgages. That plain, if not harsh, language was used was natural and is not denied. Moore testified that they told him they could put him in the penitentiary. The representatives of the loan company insisted upon a settlement. Negotiations for a sale of cattle to Callan were carried on for several days, and finally a sale was made to him of 250 white-faced yearlings and 649 two-year old white-faced cattle. The cars were ordered, and the cattle were shipped. 399 of the 649 were shipped to Kansas, were later sold at Kansas City, and the proceeds were, by direction of J. G. Callan, turned over to the loan company. These are, the cattle involved in count 1.

Part of the 399 had been taken from the Meadow pasture in Johnston county, and part from the Witherspoon pasture in Pontotoc county. The evidence indicates that all of the 399 were part of the 1,500 which Moore had shipped into Dougherty in the fall of 1927.

In reference to this sale and shipment, Moore testified: "I asked them to give two weeks to sell these cattle in, and they would not do that—they said it had to be settled right then. They said they had fooled around all they were going to about it, and that I could just take my chance—it was just up to me. Nothing was said with reference to the American First National Bank having a mortgage on these older cattle. I sold them the cattle, or agreed to let them have the cattle, and we went out and ordered the cars for the cattle to be shipped in. Mr. Callan and Mr. Freeling went into the depot, I don't know which one of them ordered the cars. They started out gathering cattle and shipping them. I told my men at the ranch to gather up certain cattle and handle them just like Mr. Callan and Mr. Freeland wanted them handled. They promised me if I would let them take the cattle they would let it drift along and let me work out the balance of it."

The 99 head of cattle involved in count 2 were sold to Omer Power, and are included in the account sales June 26, 1929, Swift-Henry Commission Company, from Omer Power, account of Jesse C. Moore. The proceeds of these cattle were by direction of Moore turned over to the loan company.

Some days after the first shipment of the cattle, W. J. Callan, brother of J. G. Callan, arrived at the ranch to look after the interests of the loan company. He was at the ranch from about May 1, to October 1, 1929. It was during his stay that the cattle mentioned in counts 2, 3, 4, and 5 were sold and shipped.

As to shipments during this period, Moore testified: "During the time that I was shipping cattle in 1929, for which Stock Yards Loan Company got the proceeds, I was also shipping cattle mortgaged to the bank, and the bank was getting the proceeds therefrom. The Stock Yards Loan Company did not force me to ship those cattle, but while we were working the cattle, we just worked the front end of the cattle and shipped them."

He also testified:

"A. Well, we shipped other cattle that went to the Bank in Oklahoma City.

"Q. Well, did the bank get the proceeds of the sales of all the others which you had except these which the Stockyards Loan Company got the proceeds of after the 1st of April, 1929? A. Yes, sir, I think so—Mr. Callan handled those cattle, and I don't know just how many cattle he shipped that the Stockyards Loan Company got the proceeds of.

"Q. But all that you had that was shipped after the 1st of April, 1929, the proceeds either went to the Stockyards Loan Company or to the First National Bank & Trust Company, is that right? A. All that I shipped, yes, sir."

The shipment mentioned in count 3 was made about May 25, 1929, the proceeds going to the loan company. The record shows that on May 27th a shipment was made and the proceeds went to the bank.

The shipment mentioned in count 4 was made about June 8, 1929, the proceeds going to the loan company. The record shows that on June 10th a shipment was made, the proceeds of which went to the bank.

The shipment mentioned in count 5. was made about July 6th, the proceeds going to the loan company. The record shows that on July 8th and July 22d shipments were made, the proceeds of which went to the bank.

Shipments were also made, the proceeds of which went to the bank on August 5th, September 2d, September 9th, October 2d and October 29th.

All of these sales, both those referred to in counts 3, 4, and 5, as well as the others, were made through commission companies, and the proceeds were applied as directed by Moore.

We have carefully considered the whole of the evidence, and we think it would not support a finding of duress within the rules laid down by the Supreme Court and by this court. United States v. Huckabee, 16 Wall. 414, 431, 21 L. Ed. 457; International Harvester Co. v. Voboril (C. C. A.) 187 F. 973; Meyer v. Guardian Trust Co. (C. C. A.) 296 F. 789, 35 A. L. R. 856; Guardian Trust Co. v. Meyer (C. C. A.) 19 F.(2d) 186.

Further, it is the general rule that only the party upon whom the duress has been exercised may take advantage of it and avoid the contract. Not only Moore has not endeavored to avoid the transactions alleged to have been made by him under duress, but he has received and retained the benefits of those transactions.

Finally, on September 10, 1929, Moore wrote a letter to Joseph L. Freeland, president of the loan company, in which he said:

"I certainly thank you for the way you have handled my business and assure you that words cannot express my appreciation of the kindness shown * * *

"With kindest regards to yourself and Milton, I am

"Very truly yours,
"Jesse C. Moore."

Moore was neither a minor nor a man afflicted with senility or weakness of intellect. He was a vigorous business man of large affairs and vice president of a bank. Duress of such a man for a period of months or even weeks is almost unthinkable. Moore was simply a debtor faced with a bad situation, and he chose the line of least resistance. He made the best bargain he could with the creditor at hand, but nevertheless did not wholly forget his duty to his other creditors.

In view of the foregoing, we think the allegations in the complaint of a conspiracy by the officers and agents of the loan company, including Moore; the allegation that the shipments of cattle, proceeds of which went to the loan company, were made by Moore under duress; the allegation that Moore made no real sales but "merely surrendered the cattle to the defendant (loan company) in payment of his obligation," are not supported by substantial proof.

Our conclusion upon the whole record is that there was a clear waiver by the bank of its rights under the chattel mortgages held by it, both as to the movements of the cattle and the sales thereof by Moore.

Description in the Mortgage upon Which Counts 3, 4, and 5 are Based.

This matter requires but a few words.

The description in the mortgage of. January 23, 1929, has been heretofore quoted. It included brand "9."

The evidence is clear and convincing that none of the cattle alleged in counts 3, 4, and 5 to have been converted and sold by the loan company bore the brand "9." Nor can this brand be disregarded, as is suggested by plaintiff, and the other marks of identification be relied upon, for the cogent reason that the evidence shows that Moore had in his possession cattle which bore the brand "9" and also the other identifying marks. Clearly, under such circumstances, the brand "9" cannot be disregarded. The cattle alleged in counts 3, 4, and 5 to have been converted were therefore not shown to be within the description of the mortgage.

Our conclusion on the whole case is that the trial court was right in directing a verdict for defendant and in entering judgment thereon.

The judgment is affirmed.