MAY WAY MILLS, INC., v. JERPE DAIRY PRODUCTS CORPORATION.

4-6345                                           150 S. W. 2d 615

Opinion delivered May 5, 1941.

*Harvey L. Joyce* and *Glen Wing,* for appellant.

*Pearson & Pearson,* for appellee.

HOLT, J.   September 15, 1939, Bill Benson executed a note in favor of appellant, May Way Mills, Inc., in the amount of $372.40 in payment for 1,000 "Barred Rock" chickens and the necessary feed to prepare them for the market.   On the same date, to secure payment, Benson

executed a chattel mortgage on the chickens in question and two Jersey cows. The mortgage was duly filed with the recorder of Washington county, Arkansas, in compliance with the statute. (Section 9434, Pope's Digest.)

January 23, 1940, while the lien of this mortgage was in full force and effect, Benson sold to appellee, Jerpe Dairy Products Corporation at Fayetteville, Arkansas, 656 of these chickens, but failed to account to appellant for any part of the proceeds from this sale.

July 12, 1940, appellant brought suit against Bill Benson on the note in question and against appellee, Jerpe Dairy Products Corporation, alleging ". . . that said sale was made without the knowledge of or notice to plaintiff, and that plaintiff has never received any part of the purchase price of said mortgaged property; that said sale constitutes a conversion of the said property, and that the purchaser, Jerpe Dairy Products Corporation, defendant herein, is liable to plaintiff for a conversion of the mortgaged property," and asked that the mortgage be foreclosed and for judgment against Benson and appellee for $476.53, plus interest and costs.

Appellee defended on the ground that the chickens had been sold to it with the consent of the mortgagee, May Way Mills, Inc., (appellant here), and that appellant had thereby waived its mortgage lien.

Upon a trial, the court entered a decree against Bill Benson in the amount of $474.19, and further decreed (quoting from the decree): ". . . that said sum is secured by a valid duly filed chattel mortgage upon two Jersey cows and the balance of 1,000 Barred Rock chickens after deducting 656 chickens sold to defendant, Jerpe Dairy Products Corporation, on January 23, 1940; that the said plaintiff's chattel mortgage included the said chickens sold to Jerpe Dairy Products Corporation and that said defendant bought said chickens from Bill Benson and paid therefor the sum of $306; that said sale to Jerpe Dairy Products Corporation was made without the knowledge of or notice to the plaintiff; that before the sale of said chickens to defendant, Jerpe Dairy

Products Corporation, the said plaintiff gave defendant, Bill Benson, permission to sell said chickens."

The court then declared the judgment against Bill Benson to be a first lien on the remainder of the 1,000 chickens, after deducting the 656 head sold to appellee, and a first lien on the two Jersey cows described in the mortgage, ordered foreclosure, and dismissed the cause as to appellee. From this decree appellant has appealed.

The question for determination here is: Did appellant waive the lien secured to it by the chattel mortgage in question, by consenting to the sale of the chickens to appellee?

It is undisputed that the chattel mortgage in question was on file and covered the chickens which Benson sold to appellee. On the question presented the rule governing is stated by this court in *Mitchell* v. *Mason,* 184 Ark. 1000, 44 S. W. 2d 672:

"This court has held that the sale of mortgaged property by the mortgagor without the knowledge or consent of the mortgagee constitutes a conversion of the property and that both the mortgagor and the purchaser are liable to the mortgagee for a conversion of the mortgaged property. *Sternberg* v. *Strong,* 158 Ark. 419, 250 S. W. 344.

"On the other hand, if a mortgagee consents to a sale of the property by the mortgagor, the purchaser takes title free from the lien. In such cases, the waiver on the part of the mortgagee may be established by oral evidence, which may be direct and positive, or may be established by circumstances surrounding the transaction. *Fincher* v. *Bennett,* 94 Ark. 165, 126 S. W. 392, and *Vaughan* v. *Hinkle,* 131 Ark. 197, 198 S. W. 705. In these cases, the court expressly held that, where a mortgagee verbally authorizes a mortgagor to sell the property and the property is sold to a *bona fide* purchaser for value, the latter acquires a good title, whether he knew of the existence of the mortgage or not."

The mortgage here contains this provision: "Should I, prior to the payment of said indebtedness, sell or at-

tempt to sell, ship, remove, or otherwise dispose of the property herein conveyed, or any part thereof, without the consent in writing of the said May Way Mills, Inc., . . . then . . . the said May Way Mills, Inc., . . . is hereby authorized . . . to take charge of said property on demand without process of law, and sell and dispose of same, or as much thereof as will be necessary at public sale. . . .''

Appellee does not claim that appellant gave written consent to Benson to sell the chickens in question, but that it gave its oral consent, and attempts to establish this contention largely by the testimony of two witnesses: Wood Benson, a brother of Bill Benson, the mortgagor, and Jim Lewis, agent of appellant.

Wood Benson testified: ''Q. Did you hear the conversation between Bill and Mr. Lewis about selling the chickens or their being ready for sale? A. Yes, Mr. Lewis said they were ready for sale. Q. What else did he say? A. He said the price was as good as he thought it would be. Q. Did he advise him to sell them? A. Yes. Q. You heard that conversation? A. Yes. Q. You heard him say that? A. Yes. Q. That was, you think, about ten days before Bill did sell? A. Yes.''

And on cross-examination Wood Benson testified: ''Q. How did he advise him? If he didn't tell him to (sell them), how did he advise him? A. He told him the chickens were ready to sell and the price was pretty good, as high as he thought it would be. Q. But he never did tell him to sell them? A. Not at any special date. Q. He never told him to sell them, he just said they were ready? A. I believe that's right. Q. And that the price was right? A. Yes. Q. But he didn't tell him to go sell the chickens? A. I don't believe he did.''

Jim Lewis testified that he was appellant's agent, sold its feed and handled its business in Washington county, and quoting from his testimony: ''Q. Did you at any time tell Mr. Bill Benson to sell his chickens? A. No, sir, I had no right to. Q. Did he ever tell you

he was going to sell? A. No. Q. Did you have any knowledge, otherwise than this you tell about, that he was going to sell his chickens? A. No, sir. . . . Q. Do you deny telling him to go sell the chickens? A. I did not. Q. How were you aiming for them to get on the market? A. That's his lookout. I wasn't at the selling end of it at all. Q. He was? A. He did. Q. If you weren't, who was? A. The grower sold them, I guess. · Q. There was nobody else to sell them but you or him, was there? A. I had no right to. Q. Was there anybody else who could? A. May Way Mills could, I guess. . . .

"Q. How long had it been before you had seen these chickens until they were sold? A. A week or ten days. Q. You knew they were about ready for market? A. Yes. Q. And you knew you weren't going to sell them? A. Yes. Q. And you knew Mr. Tribble wasn't going to? A. No, I didn't. . . .

"Q. Did you advise him to sell? A. No. Q. What did you think he was going to do, keep them? A. I didn't care. I didn't care if he ate them. Q. You knew they were grown for the broiler market? A. Yes. Q. You knew they had to be sold on that market when they were ready? A. Yes. . . . Q. And you knew you weren't going to sell them? A. Yes. Q. You knew Bill had to; you didn't tell him not to? A. No. Q. You knew he had to sell them when they were ready? A. That was his job. Q. You expect that of all growers? A. Yes. Q. And you trust them to pay the balance when the chickens are sold? A. They're all notified to make the check to May Way when they sell the chickens. . . .

"Q. You had told other growers to sell their chickens? A. Since then, I have. . . . Q. These people I have asked you about, you say you didn't tell them to sell; that they did sell their chickens, but settled with the company? A. Yes. Q. You trusted Bill Benson to do the same thing? A. Yes, sir. Q. You say you expected them to sell their chickens when they were ready? A. Yes."

Appellee's manager, George Melburn, testified that Benson called him on the 22d of January, 1940, asking for a price on the chickens, and a few minutes later came to the plant and sold him the chickens. The next afternoon appellee's truck went out and got the chickens and delivered them around 6:00 p. m. "I asked him how he wanted the check made out and he (Bill Benson) said, 'Make it to me.' I said, 'No one has any equity in the chickens beside you?' and he said, positively, 'No.' I talked about it. He said, 'I've been buying my own feed and paying cash, so make the check to me.' Under the conditions, it was late at night, that was all I could do. He was in a hurry, and we made the check out to him and gave it to him and he left with the check."

Benson cashed the check at a Fayetteville bank early the next morning, January 24th.

The morning of the 24th, after the sale, appellant learned about it, complained to appellee that appellee had bought chickens on which appellant had a mortgage. Whereupon appellee attempted to stop payment on the check, which it had given to Benson, but was informed by the bank that the check had already been cashed.

Benson did not pay to appellant any of the proceeds from the check in question.

There is other evidence in the record, which we do not deem it necessary to abstract. After a careful review of all the testimony we have reached the conclusion that a preponderance thereof supports the contention of appellant that it did not consent to waive the lien of its mortgage in this cause and that the court erred in holding otherwise.

The chattel mortgage here in question was on file at the time Benson sold the chickens to appellee and appellee was bound to take notice thereof and bought subject thereto. We think the most that can be said of Lewis' testimony, in support of appellee's position, is that as appellant's agent he called on Benson, from time to time, to note the development of the chickens and when they had reached the marketing stage, to make sug-

gestions to Benson as to the best time that Benson should market them. He did not order Benson to sell or to do anything. While the chickens belonged to Benson, yet under the express terms of the mortgage he could not sell or dispose of them without the written consent of appellant. Nowhere in Lewis' testimony did he direct Benson to sell the chickens. In fact the actual sale to appellee by Benson was not made until almost ten days after Lewis' last conversation with Benson.

Wood Benson, the mortgagor's brother who heard Lewis' conversation with Bill Benson, did not testify that Lewis told his brother to sell the chickens, but what he did say in this connection was: "Q. But he (meaning Jim Lewis) did not tell him (meaning Bill Benson) to go sell the chickens? A. I don't believe he did."

There had never been any previous similar dealings between appellant and Bill Benson, but even had there been the result would have been the same in the circumstances here.

In *Imperial Valley Savings Bank* v. *Huff*, 126 Ark. 281, 190 S. W. 116, this court said: "The mortgage in question contained a clause providing that the mortgagor should not sell the property without the written consent of the mortgagee or remove it from the county. It is insisted by the appellee that appellants waived this provision of the mortgage. They relied on the testimony of the cashier of the bank to sustain their contention. . . .

"On cross-examination the cashier admitted that there had been one or two mortgages executed by Phillips in favor of appellants before this time, and that they had permitted him to sell the cattle and apply the proceeds to the mortgage. The fact that they had done this on two previous occasions does not show that they gave Phillips the right to sell the cattle embraced in the mortgage under consideration and apply the proceeds to the payment of the mortgage debt."

In *Morton* v. *Williamson*, 72 Ark. 390, 81 S. W. 235, there was involved a provision in a chattel mortgage similar to the one here and this court said: "The mortgage

contained this provision: 'But in default of payment by the time specified, or should we suffer to be removed or disposed of, or attempt to remove or dispose of any of said personal property, then said Williamson Bros. are hereby empowered to take immediate possession of any or all of such property. . . .' This was notice to appellant that the mortgagors had no right to remove or dispose of any of the lumber without the consent of the mortgagees, and it was sufficient to put appellant upon inquiry as to the right of the mortgagors to make the sale to him."

As indicated, we think the preponderance of the testimony shows that appellant did not consent to waive the lien created by its mortgage and we hold that appellee bought the chickens in question subject to appellant's lien.

For the error indicated, the decree is reversed and the cause remanded with directions to the court to proceed in conformity with this opinion.