FARM BUREAU COOPERATIVE MILL AND SUPPLY, Inc., a corporation, Plaintiff,

v.

BLUE STAR FOODS, Inc., a corporation, Defendant.

Ottis WATSON, Plaintiff,

v.

BLUE STAR FOODS, Inc., a corporation, Defendant.

Nos. 1084, 1090.

United States District Court W. D. Missouri, Southwestern Division.

Jan. 21, 1956.

J. R. Crocker and David J. Burleson, Fayetteville, Ark., for plaintiffs.

Seiler, Blanchard & Van Fleet, Joplin, Mo., for defendant.

Watson, Richart & Titus, Joplin, Mo., for Employers Liability Ins. Co., 3rd party defendant.

WHITTAKER, District Judge.

These causes, having been earlier consolidated for trial, came on before the

Court for trial without a jury at Joplin on December 14, 1955, and were fully heard and were argued by counsel. Whereupon counsel for the parties asked, and were granted, leave to file briefs, which they have now done, and these causes have now been finally submitted for decision.

The facts giving rise to these actions are indeed "story book", and are as "unbelievable" in this modern age as they are interesting. In broad outline, they are that Watson, an experienced "chicken raiser" in Washington County, Arkansas, had 25,000 young chickens which he mortgaged, to Arkansas Farm Bureau Finance, Inc., a corporation (hereinafter called the "finance company") on May 18, 1954, as security for his note of that date, payable to the order of the finance company, in the amount of $13,599 due August 16, 1954, which mortgage was in the usual form and was duly recorded. One Lester N. Glover of Cave Springs, Arkansas, was, and for about 20 years had been, in the business of buying chickens in northwest Arkansas from "growers" and selling them to food processors, in the surrounding community, and, for the purpose maintained a place of business in Cave Springs, and a fleet of trucks and the necessary complement of employees. It was the practice of the finance company, at least upon inquiry, to advise Glover of the names and addresses of growers who had chickens ready for market and for sale, and to suggest that Glover inspect them and try to buy them from the grower. It was also the practice of the finance company to permit its old and trusted customers (which included Watson)—and in this case it orally expressly authorized Watson—to sell the mortgaged chickens at such time, for such price, and to such purchaser, as he chose, upon the understanding or condition, however, that he would pay over the proceeds of the sale to the finance company for application upon the note secured by the mortgage.

On or about the 14th of August, 1955, in response to Glover's inquiry, the finance company advised him that Watson had these chickens which should be ready for market and suggested that Glover inspect, and try to purchase, them. Accordingly, on August 14, Glover went to Watson's place, inspected the chickens and, says Watson, "agreed to buy all" of the chickens at 23¢ per pound. (Watson did not thereafter see or hear from Glover until after the 5 truckloads of chickens here involved were hauled away by Glover's men). On the next day one of Glover's trucks, manned by a driver and accompanied by several "catchers", arrived at Watson's place and was filled with Watson's chickens, after which the truck driver stopped at Watson's store and asked "how he wanted his check made out", and Watson replied "Ottis Watson", but the truck driver, feigning feared inaccuracy, asked Watson to write on a folded piece of paper, which he presented, "exactly how he wanted his check issued" and Watson wrote across that paper his true signature, and handed the paper back to the truck driver. Though there is some controversy about it, it appears that the same events occurred on each of the following 4 days when similar loads of chickens were obtained by Glover's men from Watson.

Not having received any money for the 5 truckloads of chickens and having heard that some of Glover's recent checks had "bounced", Watson went to Glover's office in Cave Springs on August 21 and asked payment for his chickens. Glover produced invoices showing live weights of each of the 5 loads and the price, calculated at 23¢ per pound, and then issued his 5 checks payable to "Ottis Watson & Farm Bureau Co-Op" for the correct amounts of $1,865.30, $1,757.20, $1,975.70, $1,867.60 and $1,925.50, respectively, aggregating $9,386.30, which checks were endorsed by Watson and delivered to Farm Bureau, who also endorsed and deposited them, but payment of each was refused, when presented, for insufficient funds.

There was a written agreement between defendant, Blue Star Foods, Inc., and Glover, dated May 1, 1954, which is in evidence, which, after reciting that

defendant is engaged in processing poultry at Anderson, Missouri, and interested in securing live poultry from that vicinity, and that Glover has certain described vehicular equipment "and is desirous of hauling live poultry" therein to defendant's plant, provides: "first party (defendant) agrees to pay and second party (Glover) agrees to accept one-half (½) cent per pound of live poultry delivered at first party's door in Anderson, Missouri, for the use of the truck or trucks hauling said poultry and the further sum of one-fourth (¼) cent per pound of live poultry at first party's door in Anderson, Missouri, in payment of services rendered either for second party or anyone hired by him." Glover was furnished with a book of blank drafts containing the name of defendant, which Glover was authorized to issue to chicken growers in payment for chickens purchased by Glover for defendant. It further appears from the evidence that Glover would phone defendant and inquire whether it needed chickens for delivery a few days ahead, and, if so, about how many and what price it would pay, and Glover would then attempt to purchase that amount of chickens within that price and issue one of defendant's drafts to the grower in payment and deliver the chickens to defendant at Anderson, Missouri. It also appears that Glover did not buy chickens only for defendant, but for himself as well and for others, and was generally engaged in that business. But it does appear that defendant, Blue Star Foods, withheld Federal income taxes and Social Security taxes from Glover's earnings from defendant under the contract mentioned.

It appears from the evidence that the blank pieces of paper, upon the backs of which Glover's truck driver asked Watson to write his name—which he did as above stated—were, in fact, blank Blue Star drafts which were later filled out by someone—the evidence does not show who, but presumably it was Glover because he got the money on them—dated August 13, August 14, August 14, August 17 and August 17, respectively, and made payable to the order of "Ottis Watson" in the same amounts as the 5 August 21 checks later issued by Glover to Watson, as above stated, signed by "Lester N. Glover" and drawn on defendant through "Anderson State Bank". These drafts, bearing the name of "Ottis Watson" on the reverse side, were each then endorsed by Lester N. Glover and were deposited by him in his bank to his credit which bank, in turn, timely presented them to defendant, who, having received the chickens and noting that the endorsements on the drafts appeared regular, accepted and paid the drafts.

Watson admits that the endorsement on the first of these drafts is his genuine signature, but, while saying that the endorsement on the other 4 drafts looks like his signature, he does not remember endorsing, and does not believe he endorsed them. I should say now, as I did at the conclusion of the trial, that comparison of these questioned signatures with admittedly genuine ones and hearing the testimony of Mr. Charles Scott, a highly competent questioned document examiner, convinces me that the name "Ottis Watson" on the reverse side of each of these 5 drafts is his genuine signature.

The evidence shows that after Glover had gotten these chickens, and the cause or causes of action therefor had accrued, Glover's note to the finance company which had matured on August 16, 1954, was past due and unpaid, and that it was against the policy of Farm Bureau to permit the finance company to hold past due paper, so, on September 2, 1954, the finance company endorsed and delivered the note to Farm Bureau and also assigned the chattel mortgage to Farm Bureau in the following terms: "For value received this chattel mortgage is assigned and transferred to Farm Bureau Cooperative Mill and Supply Company, this 2nd day of September, 1954", and at that time there was, and still is, a principal balance due on the note of $9,280.84.

These are, and I find them to be, the essential facts.

These actions are both against Blue Star Foods, Inc., (which has impleaded Employers Liability Assurance Corporation upon the theory that the latter is, or may be, liable over to it upon a certain comprehensive dishonesty bond)—the first action being by Farm Bureau, in conversion, for the value of the chickens claimed to have been owned by it, legally and equitably, under the terms of the chattel mortgage mentioned. And the second action being by Ottis Watson to recover the value of the chickens, taken by Glover, of $9,386.30 plus the difference between 23¢ per pound (which Glover had agreed to pay) and 17¢ per pound (which Watson ultimately got) for the balance of the chickens which Glover had agreed to, but did not, take, amounting to an additional $1,912.26, upon the theory that defendant was, in fact, Glover's undisclosed principal, and, hence, liable for his contract of purchase with Watson and for his fraud in these transactions.

■■ ·Dealing first with the Farm Bureau case, No. 1084, it is evident that it cannot recover from defendant for at least two reasons. The first ·is that under Rule 17 of Federal Rules of Civil Procedure, 28 U.S.C.A., "Every action shall be prosecuted in the ·name of the real party in· interest", and Farm Bureau has no title to the conversion action which it here asserts, because it was not the owner of the note and mortgage at the time of the claimed conversion—August 14 to August 18, 1954—, for the note and mortgage was owned by the finance company at that time and when the alleged conversion occurred, and the title to that cause of action became vested in it, and it did not endorse and deliver the note nor assign the mortgage until September 2 thereafter, and the assignment was but a simple assignment of the mortgage and did not purport to assign the cause of action in conversion —already vested in the finance company. It is the law that a mere assignment of a mortgage vests the assignee only with title to what then remains under the mortgage and does not, as an incident or otherwise, assign the accrued conversion action, already vested in the assignor, in consequence of an earlier conversion, Millner v. Lankershim Pkg. Co., 13 Cal. App.2d 315, 56 P.2d 1295; Robinson v. Saxon Mills, 124 S.C. 415, 117 S.E. 424, 426; Gaskill v. Barbour, 62 N.J.L. 530, 41 A. 700; First National Bank v. McCreary, 66 Or. 484, 132 P. 718, 134 P. 1180, and authorities therein cited. And, inasmuch as the mortgage assignment here was a simple assignment of the mortgage, and made no reference to the then accrued and already vested action for the earlier conversion of a part of the chickens, it did not assign to, or vest in, the assignee, Farm Bureau, any title to this action, and ·plaintiff is not the real party in interest. But inasmuch as this does not determine the merits, and inasmuch as plaintiff claims that the finance company and the plaintiff—having substantially the same officers and occupying the same quarters—were treated as, and really amounted to, one and the same interest, I consider it advisable to pass on to, and set forth, the second reason why plaintiff cannot recover.

■ The second reason why plaintiff, Farm Bureau, cannot recover, is that, as shown by the evidence above recited, the finance company, while the holder of the mortgage, expressly authorized Watson to sell, and consented to his sale, of the mortgaged chickens at such time, and at such price and to such purchaser as he might choose. This, under the Arkansas law and the general law of the subject, released the lien of ·the mortgage as to the chickens that were so sold. Vaughan v. Hinkle, 131 Ark. 197, 198 S. W. 705; Williamson v. Lesser-Goldman Cotton Co., 169 Ark. 1212, 277 S.W. 347, 348; Mayway Mills, Inc., v. Jerpe Dairy Products Corp., 202 Ark. 397, 150 S.W. 2d 615. As to plaintiff's claim that the sale authorized was "conditional", that is, was upon the understanding that Watson, the mortgagor, would pay over the proceeds of the sale to the mortgagee

for credit upon the mortgage debt, and, not having been done, the lien of the mortgage was not effectively released, the answer is that the failure of the mortgagor to pay over the proceeds of the sale to the mortgagee for credit upon the mortgage debt did not prevent an effective release of the lien of the mortgage, as against a third person who was not a party to and did not have knowledge of that understanding, as was the case here with defendant. 14 C.J.S. Chattel Mortgages, § 262, p. 876; Moffett Bros. & Andrews Commission Co. v. Kent, Mo.Sup., 5 S.W.2d 395; First National Bank & Trust Co. v. Stock Yards Loan Co., 8 Cir., 65 F.2d 226, and cases there cited. It follows that the finance company's authorization and consent to Watson to sell the mortgaged chattels and his exercise of that granted right, released the lien of the mortgage so far as defendant—a third party without knowledge of any "conditions" attached—is concerned, and, therefore, plaintiff has no cause of action against defendant in conversion of a part of the mortgaged chickens based on that mortgage, which was thus released as to the chickens in question.

I pass now to the case of Ottis Watson, No. 1090. While I have great sympathy for him, and, I think rather naturally, would like to find a way to protect him even against his own folly, which may be likened to the Greek philosopher who stepped in a well while looking at the stars and from which came the maxim "He who looks sees the peril that the heedless encounter", but I have been unable to find a basis in the law that gives any right to him against this defendant.

It cannot be, and is not, claimed by him that Glover had any *apparent* authority to act as agent for defendant for there was no mention of defendant in the transactions between Glover and Watson, and Watson thought, as he testified, that he was selling the chickens to Glover. He did not even have any knowledge of defendant in the transaction at the time he endorsed defendant's drafts, for he merely wrote his name on the back of those papers and did not even know they were drafts; and when he did not receive payment of the actual money for the chickens he went to Glover's office in Cave Springs and demanded and received Glover's checks in the amounts due him, which proved worthless. Plaintiff's claim, rather, is that he later learned—when he found out about these drafts and his claimed endorsement of them—that these chickens were really being purchased by Glover for defendant, and, he concludes that Glover was acting as agent for defendant, an undisclosed principal, and that, therefore, defendant is liable for the acts of its agent, even though he represented himself as a principal.

■■ This brings us down to the question of whether, in fact, Glover was the agent of defendant and had *actual* authority to represent and make contracts of this kind for defendant. I think the evidence shows that Glover was, and for years had been, an entrepreneur dealing in chickens for many years, to Watson's knowledge, and that Watson dealt with him as such, and that Glover was not a general agent of defendant. The contract between defendant and Glover reserved no control, or right of control, in defendant over the manner, methods or means, by which Glover would acquire and deliver chickens to defendant, nor did it require personal services by Glover, but he was free to perform, either personally or through his own agents, and at his own pleasure as to time, and no definite hours of labor or service were required. These are indicia of independence, not of employment. Coul v. Geo. B. Peck Dry Goods Co., 326 Mo. 870, 32 S.W.2d 758; Skidmore v. Haggard, 341 Mo. 837, 110 S.W. 2d 726; United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. The fact that Glover had blank drafts of defendant, and issues them to Watson in payment for the chickens, adds nothing toward a showing of employment, because—quite differently from checks—any one may lawfully draw a draft upon another, and there is no liability there-

under upon the "drawee" until he has "accepted" the draft.

There is, however, another important element to be considered in determining whether one is an independent contractor or an employee and agent, and that is the matter of intention of the parties. The contract, in evidence, indicates on its face an intention to create an independent relationship and not an employment, but a fact element indicating a contrary intention appears from the showing that defendant withheld income taxes and Social Security taxes from the earnings of Glover under the contract. It was required to do so only if Glover was an employee, and not if he was an independent contractor. This throws some doubt upon the question of how defendant regarded Glover. But there is no other evidence throwing any doubt upon the question.

The burden of proof of agency was upon the plaintiff and the plaintiff simply has not offered any evidence from which I could make a finding or a sound conclusion that Glover was defendant's agent and authorized to make the claimed contract for defendant or that defendant was liable for Glover's fraud.

But even if it be conceded—as it is not—that Glover was, in fact, the agent of defendant, as undisclosed principal, yet it is clear that when Glover, acting through his employee truck driver, fraudulently induced Watson to endorse these 5 blank drafts, he was acting in his own interest, and opposed to the interests of defendant, and, hence, not in the course or scope of any employment or authority, express or implied, of defendant, and defendant could not be liable, under this evidence, for that criminal act, which there is no showing it authorized or ratified.

Watson's counsel argue that defendant got his chickens and didn't pay him for them, and, therefore, should be held liable to do so. The answer is that defendant did pay for these chickens by accepting, when presented, and paying the 5 drafts issued therefor, and each of which bore the endorsement of Watson. And Watson, in legal effect, got the money on the drafts. For when he endorsed those drafts—though induced to do so by fraud of Glover or Glover's employee—and handed them back to Glover's employee, the drafts became "couriers without baggage" and were negotiable instruments in the stream of commerce, and passed by delivery. And, as against defendant, the result is no different than it would have been if Watson had actually gotten cash or its equivalent in exchange for the endorsed and delivered drafts.

The rule is legend that where one of two innocent parties is required to bear a loss, the one whose act made the loss possible must bear it. There can be no doubt that the act which resulted in the loss—as between plaintiff and defendant—was the endorsement by Watson of these blank drafts and his placing them "as couriers without baggage" in the stream of commerce, and, therefore, sympathetic as I am to him, I can find no basis under the evidence and upon the *law to rest a judgment against defendant in his favor.*

The conclusion, in each of these two cases, must be, and it is, that under the law and the evidence neither of the plaintiffs are entitled to recover in these actions, and that judgments must be entered in favor of the defendant.

This leaves no issue for determination upon or under defendant's third party complaint against Employers Liability Assurance Corp., and that third party complaint should be dismissed.