## McBee's Adm'x v. Indian Head Mining Co.

Oct. 13, 1939.

C. A. Noble for appellant.

Craft & Stanfill for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Appellee operates a coal mine and maintains a min-

ing camp near Bulan in Perry County. It had in its employ one Pearl Centers, who had been night watchman for two years. On the night of December 12, 1937, Centers killed Robert McBee on the premises of the company. The homicide forms the basis of an action by the appellant, in which she as administratix sought recovery of $25,000 by way of damages to the estate of deceased.

In her petition, filed November 12, 1937, naming appellee and Centers defendants, she alleged that on the night in question McBee went to appellee's mining camp for the purpose of visiting one Will Smith who lived in the Company's camp, and was killed by Centers.

As her cause against appellee, she says that it knew at the time that Centers carried a shotgun for the purpose of protecting its properties, and had given him instructions to patrol and "protect its property from intruders and trespassers, and to evict from the premises any person found thereon who was not employed by the company, and the said Centers had instructions from his co-defendant to do the acts herein above described."

More particularly she alleges that while McBee was traveling along his way across the property of appellee in a lawful purpose, the defendant (Centers), at the time believed in good faith, that McBee was about to injure the property of appellee, and in due course of his employment, under the instructions of appellee "wrongfully and with gross negligence, carelessness and recklessness, shot and killed * * * McBee, the result being to destroy his power to earn and thereby damaging his estate."

She also alleges that appellee well knew that Centers carried the shotgun for the purpose of protecting appellee's property, since they had instructed him to do so, and as well, to evict trespassers and "to shoot or eject any person found thereon, and Centers was at the time acting under such instructions." She also says, referring to Centers: "He was a nervous and excitable person and dangerous to be armed with a gun at the time he was employed," and with such knowledge appellee nevertheless kept said defendant for the purposes "herein set out."

Appellee in answer denied the material allegations of the petition, and by amendment affirmatively plead that at the time of the homicide, McBee had made

attack upon Centers; that they had engaged in a per-
sonal rencounter, and as a result thereof McBee lost his
life; that the engagement constituted no part of the
night watchman's duties. It was further alleged that
the difficulty in which McBee lost his life was brought
on solely by him, and that his acts constituted the sole
proximate cause of his death, since Centers was acting
in his self-defense, and that whatever Centers did on the
occasion, as complained by appellant, was without its
authority or instructions.

Centers filed separate answer in which he denied the
charges contained in the petition and plead affirmatively
in form and substance the same defensive matters as set
up by appellee. By agreement of parties all affirmative
matter was controverted of record.

At the close of appellant's evidence appellee moved
for a directed verdict, the court sustaining the motion;
the jury as directed returned a verdict. Appellant in
due time filed her motion for a new trial, the sole ground
being that the court erred in directing a verdict for ap-
pellee.

Appellant testified that her husband, a coal loader,
was forty-four years of age at the time of his death.
She saw him alive the last time at Duane about 6:30
p. m. on the day he was killed. He got out of the car,
saying he believed he would go back to town (Hazard).
She knew nothing of the circumstances surrounding the
homicide.

Walter Taylor testified to the same facts, and added
that McBee at the time was sober, and says, "If he
drunk any that day I didn't see him drink." He said
McBee got out of the car while it was moving.

A former sheriff of the county testified that on the
night of the homicide he received information that some
one had been killed at appellee's camp. He went to the
camp at once and found McBee dead. Centers was pres-
ent. McBee's body was lying a few feet from the door
of the sand house. He had a pipe in his left hand; the
other hand was in his overalls' pocket. The gun shot
wound was "somewhere about the top of his overall bib,
a very large hole." Centers had an automatic shotgun.
McBee had an unopened pint bottle of whiskey in his
pocket. Another witness testified to the same facts, and
added that McBee had a small pocket knife in his

"pants pocket." Another witness saw McBee shortly before the homicide and said "he looked like he wasn't drunk."

The undertaker who prepared McBee's body for burial, said, "The wound was a large one, about the size of a silver dollar," half-way between the left nipple and center of the breast. There was no evidence of powder burn on the body. Nothing was said about the condition of his clothing.

At this point Centers was called as a witness for the plaintiff. He testified that at the time of the killing he was night watchman at the mining camp, at times performing other duties. He says he was carrying the shotgun because sometime before, the store had been robbed, and the robbers had shot at him. "I was carrying the gun to protect myself and the property." He "supposed" that Heath, the general manager of the company, knew he carried the gun, and "guessed he had seen him with it," though he was absent most of the night time. He had not seen Mr. Heath that night. He stated that the gun did not belong to him, and that he got it out of the building, assuming that it was there for the use of the night watchman.

Upon cross-examination he said it was his duty and custom to make the rounds of the camp at certain hours at night and punch his signal clock on every round. When the homicide occurred, the witness says, "I was coming from the store back to the mine between the repair shop and the supply house, which is about twenty feet from the drift mouth, and the same distance from the sand house." One traveling toward Bill Smith's house would not take the path where he later discovered some three or more persons on the premises. He says as he was going from the power house to the tipple to punch the time clock, two other men fell in behind him, and one attacked him and in a scuffle both were on the ground; a third person came from behind a building on the other side next to the drift mouth. He could not tell who all the men were, as one had knocked his light from his hand. The third man was in between two buildings and "came at me, right up in my face, when me and the other fellow got up from the ground." He had never seen McBee before this time. He says he shot the man who was coming at him because "I was fighting for my life, and that was the only chance I had out of it. They

had me hemmed in between two buildings and I didn't have a chance to run if I wanted to." He says that some persons who went up the hill, on the public road, as he was on his six o'clock round, called out, "Don't fool with us, we're spreeing tonight; we'll come up and get you."

On cross-examination by appellee's attorney Centers said he did not shoot because he thought the company's property was about to be disturbed, but because in the skirmish deceased was coming right at him. "He was right up in my face, I was trying to save myself." He says that the only instructions he had were "that if anything occurred there to come to the old man, Mr. Heath, the general manager." He testified that no one connected with the company had instructed him to use any fire arms to protect the company's property. Centers had drawn $56 at the commissary that afternoon and some colored fellow pulled some money out of his (Centers') pocket and flashed it in the crowd.

Describing the alleged assault a little more definitely, he said the man with whom he was scuffling had hold of his pocket, "tore my pocket off, and had my punch clock strap pulled right up in my face, under my chin, when two other men rushed him about the time he fired the first shot." He says he fired two shots, "but they both come almost as one shot, it was all done quick." On this cross-examination he emphasized that neither Mr. Heath nor anyone else connected with the company had ever told him to use the gun which he had, or had given him authority to carry or use a gun. He kept his clock and flashlight, which he furnished himself, in the supply house. He had bought the gun shells himself.

The argument of appellant's counsel is that, "It is true that upon cross-examination the witness (Centers) attempted to explain the manner in which McBee was shot and killed, and to justify the killing upon his part; however, appellant was not bound by the evidence elicited by the appellee's attorney, and could show any facts or circumstances contradicting this witness as to the manner in which McBee was killed." The latter conclusion is undoubtedly correct.

He then points out specific parts of evidence which he claims would lead to the conclusion that Centers was not giving the true version. The position of the body; the absence of powder burns on the body, and the size

of the gunshot wound, indicating that McBee was at some distance from Centers when the latter fired the shot; that McBee was sober some time before the encounter. All of which counsel says, disputes the fact that "McBee was attacking and had hold of him at the time of the shooting," a statement never made by Centers.

In summing up, counsel says:

"When the evidence is summarized we have as facts that Centers was duly employed as night watchman by appellee, and armed with a shotgun furnished him by the appellee; that he was in due course of his employment upon appellee's premises at the time, and that he killed McBee in the course of his employment, with the gun furnished by appellee;"

hence the appellee was responsible for his acts at the time.

Appellant, in support of his contention, relies on this court's opinion in the case of Robards v. P. Bannon Sewer Pipe Company, 130 Ky. 380, 113 S. W. 429, 432, 18 L. R. A., N. S., 923, 132 Am. St. Rep. 394, and some foreign cases upholding the principle of law laid down in the Bannon case. In that case the only question before us was the propriety of the court's ruling on demurrer to the original and two amended petitions. We said:

"Where the master employs a watchman and authorizes him to use firearms in his discretion, we cannot hold as a matter of law that the act of the watchman in shooting a third party who, at the time, was only near the premises, is conclusive evidence of the fact that the watchman was not acting within the scope of his employment. The master cannot escape liability for the acts of his servant when he has given the servant authority to act and the discretion when to act, and the servant negligently acts at a time when such action was not necessary."

In the case of John v. Lococo, 256 Ky. 607, 76 S. W. (2d) 897, 899, appellee was sued for damage to a young lady, who, while standing in the street, was struck by a missile thrown by Lococo's employee at some boys who

had taken fruit from a stand in front of the store. We held the employer not liable, saying:

"If the assault of a servant of a third person is done in the execution of the authority given him by the master and for the purpose of performing what he was directed to do, the master is responsible whether the wrong done was occasioned by a wanton, willful purpose, or to accomplish his business in an unlawful manner, but, if the servant commits a wrongful act without authority, and not for the purpose of executing the orders or doing the work of his master, the latter is not responsible therefor."

A summary of the proof shows that it was not the duty of Centers, nor was he directed by any officer of the company, to carry a gun. The proof shows that Centers, who had theretofore been shot at five or six times on one occasion, and who had reasonable grounds for believing that he might be later assaulted, carried the gun for his own protection. There is no proof, by fact or circumstance, that he was not set upon in the manner described by him. We need not discuss whether or not the proof was sufficient to demonstrate conclusively that he fired in his self-defense, or in sudden affray, though we may say there is no contrary proof in the record. There was a lack of proof to indicate that McBee was about to injure or had intention of molesting appellee's property. There was a total failure of such proof as would be necessary to hold the appellee liable for the act of Centers. Other cases embodying the principle as laid down in the cases cited supra are Brooks v. Gray-Von Allmen Sanitary Milk Company, 211 Ky. 462, 277 S. W. 816, 46 A. L. R. 1207; General Refractories Company v. Mozier, 235 Ky. 252, 30 S. W. (2d) 952; Creamer v. Kroger Grocery & Baking Company, 260 Ky. 544, 86 S. W. (2d) 288.

We are of the opinion that the lower court properly directed a verdict, and the judgment is affirmed.