## Brooks, et al. v. Gray-Von Allmen Sanitary Milk Company.

(Decided November 27, 1925.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

1. Master and Servant—Master Responsible for Servant's Willful Misconduct Within Scope of Employment.—Master is responsible for injuries occasioned to third persons by any negligence or willful misconduct of which his servants are guilty while acting within scope of their employment.

2. Master and Servant—When Tort is "Within Scope of Employment," Stated.—To render principal liable for his agent's torts, they must have been committed while carrying out principal's business, and

tort of an agent is "within course of his employment" where agent in performing it is endeavoring to promote his principal's business within scope of actual or apparent authority conferred on him for that purpose; but, if he steps aside from principal's business for however short a time to do acts not connected with such business relation, his agency is for that time suspended and he is not acting "within course of his employment."

3. Master and Servant—Fraudulent Acts of Servant Held Not Acting Within Course of Employment.—Act of agent in inserting fraudulent charge for goods not contained in a bill already indorsed as correct, which constituted forgery, whether servant did so before or after indorsement of plaintiff's receiving clerk, suspended relationship of master and servant for time being, and while so engaged servant was not acting within course of employment, and hence master was not liable for his peculations from plaintiff.

4. Fraud—Buyer Complaining of Fraudulent Charges for Goods Held Negligent.—Master held not liable for peculations of servant from plaintiff by inserting fraudulent charges for goods not contained in a bill already indorsed as correct, and presenting duplicate bill for payment, irrespective of whether he was then acting in course of his employment, since ordinary care required plaintiff to see that duplicate bill corresponded to original, and, if it was duty of plaintiff to honor only original bill, then it was negligence on his part to pay one which was indorsed by a carbon signature, character of which was discoverable in slightest inspection.

EUGENE R. ATTKISSON for appellant.

LAWRENCE S. GRAUMAN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and plaintiff below, H. G. Brooks, for a number of years prior to the filing of this action conducted a retail grocery store in the city of Louisville in which he handled for his trade milk and all of its products, while appellee and defendant below, Gray-Von Allmen Sanitary Milk Company, during such time was a wholesale dealer in milk and a manufacturer of its products, and plaintiff purchased such articles for his retail trade from defendant, and it employed about 27 trucks in delivering each morning its products to its customers and they were driven by as many employees who would make deliveries to defendant's customers in their respective territories. The driver so employed and who made such deliveries to plaintiff from October 18, 1920, to September 24, 1923, was Arthur J. Tucker, and it is alleged in plaintiff's petition that he falsified the daily bills presented to and collected by him from plaintiff between the

dates mentioned to an aggregate amount (less a payment made by him) of $7,180.83, for which it sought judgment against defendant under the doctrine of *"respondeat superior."* Several amended petitions were filed, in one of which plaintiff set out the alleged peculations of defendant's servant each day of the period for which recovery was sought, and defendant's demurrer filed to the petition as amended was sustained and plaintiff declining to plead further his petition was dismissed, and complaining of that judgment he prosecutes this appeal.

In describing the manner of the deliveries by defendant's servant and the payments made to him by plaintiff therefor, the petition avers: ''The defendant, through its truck driver and agent in charge of a delivery truck, would deliver the said merchandise to plaintiff, and would present a ticket with the items contained thereon to plaintiff's receiving clerk, who would check off the items, sign the said itemized ticket, which was contained in and a part of a regular record book of deliveries furnished by defendant to its said truck driver and agent, and containing in print thereon, the name and address of defendant and other matter peculiar to its business, and that the said truck driver and agent of defendant would take said ticket up to the bookkeeper and cashier, in a different part of plaintiff's store, and the said ticket containing the signature of plaintiff's receiving clerk would indicate the amount of payment required, and plaintiff's bookkeeper and cashier would pay the amount thereof to defendant's truck driver and agent; that in this way, the transactions were all in cash. . . . That on and after October 18th, 1920, the truck driver and agent adopted a plan for increasing the amount of the payments to be made to defendant through him, and in pursuance of said plan, inserted in the record book furnished him by defendant beneath the itemized list which was checked off by plaintiff's receiving clerk, an additional sheet whereon was listed a much larger quantity and number of items of milk, butter, and milk products than were received by the receiving clerk, and so arranged that when the receiving clerk signed the regular ticket, a carbon paper reproduced the signature on the additional sheet so inserted by said driver and agent; that instead of presenting the regular ticket signed by the plaintiff's receiving clerk, the said truck driver would present the ticket containing the added items and amount, and would receive payment thereon of larger sums than the signed and checked ticket

called for." Then follows a statement of the amounts so fraudulently received, and an allegation that the servant of defendant while so fraudulently acting did so as defendant's agent in the performance of his duty as such and in the course of his employment and that plaintiff was thereby deceived and caused to pay the falsified bills; that it did not know, and could not by the exercise of reasonable and ordinary care, of the frauds perpetrated on it, and that, under the doctrine, *supra,* defendant was liable to plaintiff in the amount sued for. It was not alleged that defendant profited by or knew of such fraudulent conduct.

It will be seen at once that a difficult and narrow question is presented by the appeal, growing out of the doctrine, *supra,* as applied to the relation of principal and agent and master and servant. Some idea of the difficult nature of the question may be obtained when it is remembered that Mr. Labatt in the second edition of his most excellent work on Master and Servant, volume 6, devotes 391 pages to its discussion and which covers sections 2224-2346, both inclusive. There is no trouble about the prevailing general rule that all text writers and courts adopt, which is, that, "A master is responsible for injuries occasioned to third persons by any negligence or wilful misconduct of which his servants are guilty while acting within the scope of their employment." Labott's Master and Servant, section 2224. Some courts and lawwriters in defining the liability use the phrase "course of employment" as synonymous with "scope of employment" (2 Corpus Juris, 852). But whether those two phrases mean the same in measuring the master's liability for the acts of his servant (whether malicious or not) is not material in this case and we will take neither time nor space in analyzing them in an effort to point out their difference.

So far there is no trouble; but it is encountered in abundance when it is attempted to define those terms. Before attempting to do so we deem it proper to say that up to comparatively recent times the common law courts both in England and this country denied liability of the master for the *wilful* and *malicious* acts of his servant, regardless of whether they were done in the course of, or scope of his employment. Since about the middle of the nineteenth century, courts began to hold the master liable for the wilful and malicious acts of his servant when done within the course or scope of his employ-

ment, and the books are now full of cases wherein the master was held civilly liable for unwarranted assaults made upon third persons, or trespasses to property by the servant while acting for and on behalf of his master in prosecuting the latter's business. But that rule is not applied in its broadest aspect so as to include wilful and malicious acts of the servant, though perpetrated *during* his employment, unless in promotion of his principal's business and while he is acting within the scope of the actual or apparent authority conferred upon him by the master for the particular purpose, and the modern rule now seems to be, as stated in 2 Corpus Juris 853, that, "In order to render the principal liable for his agent's torts they must have been committed while carrying out the principal's business, and it may be stated broadly that the tort of an agent is within the course of his employment where the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose. But if the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business the relation of agency is for that time suspended, and the agent is not acting within the course of his employment."

In 18 R. C. L. 799, section 256, the writer discusses the liability of the master for the wilful, malicious, or intentional wrongs of his servant, and points out that there exists a conflict between the courts as to when liability attaches for such acts of the servant, and it is further shown therein that the rule has been modified in the manner pointed out by Mr. Labatt, and to which we have referred. In laying down the modern rule the latter part of the section of R. C. L., referred to, says: "The rule, however, established by the later authorities does not make the responsibility of the employer depend on the question whether an injury inflicted by the employer was wilful and intentional or unintentional, but upon the question whether the employee when he did the wrong acted in the prosecution of the employer's business, and within the scope of his authority, or had stepped aside from that business, and done an individual wrong. These decisions assert that the employer should be held responsible for the acts of his employee, when done in the course of his employment with a view to the furtherance of his employer's business, and not for a purpose personal to him-

self, whether the same be done wilfully and intentionally, or merely carelessly and heedlessly.'' It will, therefore, be seen that even under the modern rule the act of the servant for which liability is sought to be established against the master though wilful must have been done, not only in the course of the servant's employment, but also, ''With a view to the futherance of his employer's business, and not for a purpose personal to himself;'' and that, ''If the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business the relation of agency is for that time suspended, and the agent is not acting within the course of his employment.'' As to what is necessary to constitute such ''stepping aside'' by the agent or servant sufficient to suspend the relationship so as to relieve the master from liability for the act done by the servant, the Supreme Court of Wisconsin in the case of Fireman's Fund Insurance Co. v. Schribner, 150 Wis. 42, 135 N. W. 507, 45 L. R. A. (N. S.) 314, Ann. Cas. 1913E 823, said: ''In connection with the foregoing it must be appreciated that the element of stepping aside, commonly found in the rule, does not require any particular period of cessation from the business or going away from the place thereof. A mental attitude of stepping aside, even momentarily, turning the attention to the accomplishment of a purpose solely outside of that of promoting the object of the employment, effectually breaks the connection between the servant and the master, leaves no 'nexus' between them, as said in the authorities, vital to the latter's liability.''

To undertake to notice in this opinion the great number of cases cited in the brief of attorneys for both sides and apply the facts of this case to the principles announced in those cases as deduced from the facts in each of them, and to point out the differences in those facts, would require the writing of a treatise on the subject, and involve a task extending far beyond the scope of an opinion, which should always be rendered upon the particular facts in the case.

The facts of this case, as alleged in the petition as amended, are, that plaintiff had in his employ both a receiving and a paying clerk; that the former would check off the items of merchandise delivered as contained on the original bill therefor, and after ascertaining its correctness he would O. K. it by subscribing his name

thereto. Defendant's servant was supposed to take that particular ,O. K.'d bill to plaintiff's paying clerk, .who would pay it upon the faith of the endorsement of the receiving clerk. Instead, however, of defendant's servant presenting the original bill so endorsed to the paying clerk, he would present one O. K.'d or endorsed by a carbon signature of the receiving clerk, and receive payment. for its total amount, including the .falsified items, and which latter he necessarily inserted and prepared at some time prior to obtaining the carbon endorsement of the receiving clerk, since it would be practically impossible for him to make such alterations in carbon between the time of obtaining the endorsement and receiving payment, during all of which time he was no doubt in plaintiff's store. It requires no argument to show that the act of inserting fraudulent charges for goods not contained in a bill already endorsed as correct, is forgery within the law, and .whenever defendant's servant stepped aside for the purpose of committing it, whether he did so before or after the endorsement of the receiving clerk, the relationship of master and servant between him and defendant was for the time suspended, and while he was so engaged he was not acting within the course of his employment, since he was not carrying out his principal's business and was acting in furtherance of a purpose personal to himself. We do not regard the case as analogous to the peculations committed by cashiers or tellers of banks through fraudulent alterations of their books, or even by a forgery, since such officers are employed to correctly keep the accounts of the bank and those of its customers; while here, the only duty of defendant's servant was to present and collect the endorsed and O. K.'d bill made by plaintiff's receiving clerk and not a forged one with only a carbon O. K., or endorsement upon it.

Supporting the conclusions above expressed is the opinion of the Supreme Court in the case of Friedlander v. Texas and Pacific Railway Company, 130 U. S. 416. In that case a regular station agent of the railway company acting in collusion with another issued to him a fraudulent bill of lading, whereby it was made to appear that the carrier had received for shipment from the collusive shipper 200 bales of cotton, when in fact he had neither received nor expected to receive any such freight for shipment. His confederate, the fraudulent shipper,

took the bill of lading and drew a draft on plaintiffs with the bill of lading attached and with his endorsement thereon, and they honored the draft. Afterwards the action was brought against the railway company by plaintiffs, the drawers in the draft, to recover its amount, upon the ground that the company converted the freight. Its defense was, that it had never received the freight stated in the bill of lading, and that it was a forgery and its agent in issuing it committed a malicious act for which it was not responsible, and the court sustained that defense.

In the case of Robinson & Co. v. Bank of Pikeville, 146 Ky. 538, 142 S. W. 1065, 37 L. R. A. (N. S.) 1186, one of the questions involved was whether a client whose debt was paid by check on a fraudulent account made with a bank by forging the endorsement of the payee on the deposited check that created the account, was chargeable with the fraud of his attorney who, it was claimed, participated in the forgery by means of which the account in the bank was created. In refusing to hold the client liable for the fraudulent acts of its attorney in creating the account, from which the client's debt was paid, in a suit against the latter by the bank, we said; "Certainly Kilgore (the attorney) had no authority, express or implied, to assist in practicing a fraud upon the bank or anyone else. If he did so assist, he was acting entirely outside of the scope of his employment, and the appellant is not bound by what he did. Hardy v. Chesapeake Bank, 51 Md. 562, 32 Am. Rep. 325, and Weisser v. Denison, 10 N. Y. 68, 61 Am. Dec. 731. As the agent or attorney of appellant in the collection of this debt against Bailey, the authority of Kilgore was limited to the matter that related to the collection of the debt." It might have been argued in that case that when the attorney was assisting his client's debtor to procure the funds with which to pay the debt, he was acting for and on behalf of his client and in furtherance of the latter's business, but we held otherwise and the principle there decided, we think, is applicable to the facts of this case.

Moreover, it is doubtful if plaintiff could recover under the facts alleged, if we entertained a different opinion from that above expressed. It will be observed that it is alleged in the petition that the method of doing business by plaintiff was, that his receiving clerk would endorse the bill of merchandise purchased from defend-

ant each day, and that the latter's servant would present *that* bill to plaintiff's paying clerk. If that was true it is difficult for us to see wherein it could be held that either one or both of plaintiff's agents were free from negligence. Surely, for the long length of time during which the frauds were perpetrated, the receiving clerk would discover the existence of a duplicate bill, as well as a carbon sheet, under the one he was signing; and if so, ordinary care would seem to require of him that such a duplicate bill corresponded with the original one, and which would undoubtedly be true if it was his duty to endorse them in duplicate. However, if that was not true, and it was the duty of the paying clerk to honor only the original bill, then it was negligence on his part to pay one which was endorsed by only a *carbon* signature and which character of signature was discoverable by the slightest inspection.

Our conclusion, therefore, upon the whole case is, that the court correctly sustained the demurrer filed to the petition, and the judgment is affirmed. Whole court sitting.