The FARM BUREAU CO-OPERATIVE MILL AND SUPPLY, Inc., and Ottis Watson, Appellants,

v.

BLUE STAR FOODS, Inc., Appellee.

No. 15587.

United States Court of Appeals Eighth Circuit.

Nov. 13, 1956.

Farm Bureau Cooperative Mill & Supply, Inc., v. Blue Star Foods, Inc., and the other entitled Ottis Watson v. Blue Star Foods, Inc. As there was a common defendant in the cases and the parties to the separate actions were represented by the same counsel in each case the trial court consolidated the cases for trial and they were tried to the court without a jury. We shall refer to the parties in each case as plaintiff and defendant.

In the first of these cases, Farm Bureau Cooperative Mill & Supply, Inc. v. Blue Star Foods, Inc., plaintiff sought to recover judgment on the theory that the defendant had converted to its own use certain chickens belonging to one Watson on which it held a chattel mortgage. After alleging the fact of diversity of citizenship and the jurisdictional amount involved the complaint so far as here material charged:

"2. That on May 18, 1954, for value received, one Ottis Watson, of Route 7, Fayetteville, Arkansas, executed a promissory note in the principal amount of $13,599.00, with interest thereon at 6% per annum until paid, due and payable August 16, 1954 in favor of Arkansas Farm Bureau Finance, Inc., Fayetteville, Arkansas, and on that date of May 18, 1954, delivered said note to the said payee; that to secure payment of the said note, the said Ottis Watson did on May 18, 1954, execute and deliver to the said payee a chattel mortgage on 25,000 broilers, among other chattels, as particularly set out and described in said mortgage which was filed in the office of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas on June 2, 1954 at 1:45 P.M. a copy of which mortgage is attached hereto and made a part hereof; that said property was located in Washington County, Arkansas at the time of execution and delivery of said mortgage to said payee; that on September 2, 1954 said payee assigned and transferred said note and mortgage to plaintiff herein, for value received.

E. J. Ball, Fayetteville, Ark. (David J. Burleson and J. R. Crocker, Fayetteville, Ark., were with him on the brief), for appellants.

Herbert Van Fleet, Joplin, Mo. (F. H. Richart, Seiler, Blanchard & Van Fleet and Watson, Richart & Titus, Joplin, Mo., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

GARDNER, Chief Judge.

There are merged in this appeal two actions, one entitled in the trial court

"3. Plaintiff states that after crediting said indebtedness with all payments made thereon there is a balance due plaintiff as of the date of filing of this complaint the sum of $9,280.84, plus interest, at 6% per annum until paid.

"4. That said indebtedness was due and payable in its entirety on August 16, 1954 and no part of the said sum of $9,280.84 has been paid.

"5. Plaintiff further states that legal title to the said mortgaged property was vested in plaintiff by virtue of said mortgage; that one Lester N. Glover did, on or about August 14, 1954 take possession of the said mortgaged chickens without making payment therefor; that the said Lester N. Glover did, subsequent to his taking possession of said mortgaged chickens, deliver the said mortgaged chickens to the defendant at Anderson, Missouri, without the knowledge or consent of this plaintiff or plaintiff's assignor; that according to plaintiff's information and belief, the mortgaged property so delivered to defendant was 40,810 pounds of chickens, and that the fair market value of said chickens, when they were taken by the said Lester N. Glover, was 23¢ per pound; that defendant in turn sold, conveyed and/or disposed of said mortgaged chickens to person or persons unknown to plaintiff, and that no part of the said indebtedness has been paid plaintiff or plaintiff's assignor by defendant, but that defendant appropriated and converted the proceeds from the sale of said chickens to defendant's own use and benefit, and that by reason of said unlawful appropriation and conversion, this plaintiff is entitled to recover from defendant the sum of $9,280.84 with interest thereon at 6% per annum from May 8, 1954 until paid."

Judgment was accordingly demanded for the sum of $9,280.84 with interest thereon at 6% per annum from May 8, 1954 until paid. Defendant answered,

admitting the allegations of fact conferring jurisdiction on the court, but categorically and specifically denied all other allegations.

In Ottis Watson v. Blue Star Foods, Inc. plaintiff sought to recover the alleged unpaid purchase price for certain chickens sold to the defendant and damages for alleged breach of contract for defendant's failure to buy all of plaintiff's chickens. Omitting all allegations going to the jurisdiction of the court plaintiff in this action alleged:

"2. That on or about August 14, 1954, plaintiff entered into an oral contract with one Lester N. Glover, of Cave Springs, Arkansas, under the terms of which contract the said Lester N. Glover agreed to purchase, at the agreed price of 23¢ per pound, approximately 25,000 head of chickens from plaintiff, the said 25,000 chickens being all of plaintiff's chickens which were ready for market at that time; that on or about August 14, 1954, the said Lester N. Glover took possession of approximately 13,500 of the said chickens, had them loaded in trucks and removed them from plaintiff's possession in compliance with the terms of the said contract; that the said 13,500 chickens taken by the said Lester N. Glover weighed 40,810 pounds, the agreed purchase price thereof being $9,386.30, but the said Lester N. Glover did not make payment thereof to plaintiff, and no part of said sum has been paid, although due demand thereof was made to the said Lester N. Glover.

"3. That notwithstanding the contract existing between Lester N. Glover and plaintiff as aforesaid, the said Lester N. Glover did not return to take possession of the remaining chickens of plaintiff, although plaintiff held the said chickens for Lester N. Glover under the terms of the said contract; that by reason of the breach of contract by Lester N. Glover, and as a direct result thereof, this plaintiff was forced to take

a loss of 6¢ per pound on the remaining chickens, or a total of $1,980.00, plus $200.00 additional labor costs, a total of $2,180.00.

"4. That on or about January 27, 1955, plaintiff discovered that the said Lester N. Glover was in fact an agent of defendant, and that the said Lester N. Glover entered into the said contract to purchase plaintiff's chickens as agent for defendant, and that the said Lester N. Glover was acting within the scope of his authority as such agent for defendant in entering into the said contract with plaintiff, and that Lester N. Glover was acting within the scope of his authority as agent for defendant when he took possession of the first lot of chickens as aforesaid; that the first lot of chickens, amounting to 40,810 pounds was delivered to defendant at Anderson, Missouri.

"5. That by reason of the purchase of plaintiff's chickens, and the contract to purchase chickens as aforesaid, by defendant's agent, and as a direct result thereof, this plaintiff is entitled to recover from defendant the sum of $11,566.30, plus interest thereon at the legal rate from August 14, 1954 until paid."

Defendant admitted the allegations going to the jurisdiction of the court and in effect denied all other allegations, and charged that the complaint did not state facts entitling plaintiff to any relief.

As has been observed, the actions were consolidated for purposes of trial and were determined by a judgment pursuant to findings of fact and conclusions of law, duly made and entered in favor of defendant and against the plaintiffs on all the issues, and each of the plaintiffs has appealed.

Bearing on the material issues in Farm Bureau Cooperative Mill & Supply, Inc. v. Blue Star Foods, Inc. [137 F. Supp. 490] the court found that:

"* * * it is evident that it cannot recover from defendant for at least two reasons. The first is that under Rule 17 of Federal Rules of Civil Procedure, 28 U.S.C.A., 'Every action shall be prosecuted in the name of the real party in interest', and Farm Bureau has no title to the conversion action which it here asserts, because it was not the owner of the note and mortgage at the time of the claimed conversion —August 14 to August 18, 1954—, for the note and mortgage was owned by the finance company at that time and when the alleged conversion occurred, and the title to that cause of action became vested in it, and it did not endorse and deliver the note nor assign the mortgage until September 2 thereafter, and the assignment was but a simple assignment of the mortgage and did not purport to assign the cause of action in conversion—already vested in the finance company. * * *

"The second reason why plaintiff, Farm Bureau, cannot recover, is that, as shown by the evidence above recited, the finance company, while the holder of the mortgage, expressly authorized Watson to sell, and consented to his sale, of the mortgaged chickens at such time, and at such price and to such purchaser as he might choose. This, under the Arkansas law and the general law of the subject, released the lien of the mortgage as to the chickens that were so sold."

In seeking reversal in Farm Bureau Cooperative Mill & Supply, Inc. v. Blue Star Foods, Inc., plaintiff urges that (1) the court erred in holding that plaintiff was not the real party in interest because Rule 17(a) of the Federal Rules of Civil Procedure authorizes a holder of a negotiable instrument to sue in his own name to enforce his rights thereunder, (2) the court erred in holding that plaintiff waived its lien because waiver of the lien was not pleaded as a defense and was, hence, not available as a defense, and (3) the court erred in hold-

ing that Glover was not acting as agent for defendant in securing the chickens from the mortgagor.

■ Plaintiff, by assignment, was the owner of a promissory note signed by one Ottis Watson and of a chattel mortgage on certain chickens given by Watson to secure the note. The mortgage had been duly recorded in the county where the chickens were located but plaintiff did not acquire the note and mortgage until after the mortgaged property had been sold and disposed of by the mortgagor, and the court held that the transfer of the note and mortgage after the breach of the mortgage by sale of the mortgaged property did not transfer to plaintiff the tort action for conversion arising by reason of the breach of the mortgage. We think the court was correct in so holding. Millner v. Lankershim Packing Co., 13 Cal.App. 2d 315, 56 P.2d 1295; Robinson v. Saxon Mills, 124 S.C. 415, 117 S.E. 424; Gaskill v. Barbour, 62 N.J.L. 530, 41 A. 700; First National Bank v. McCreary, 66 Or. 484, 132 P. 718, 134 P. 1180; Wasson v. Taylor, 191 Ark. 659, 87 S.W. 2d 63. In Robinson v. Saxon Mills, supra, the Supreme Court of South Carolina in referring to a similar contention as here urged said, inter alia:

"It is unquestionably true that a right of action for a tort which has affected property, real or personal, may be assigned. * * * But that does not meet the question here, which is whether or not the assignment of the notes and mortgages *ipso facto* constituted the assignment of a right of action for a tort which had theretofore been committed in reference to the property covered by the mortgages; for conversion is a tort. Here it appears that the conversion took place in October, 1920, and the assignments were executed in December following. The authorities are overwhelming that the plaintiff, to maintain trover and conversion, must show title or right to possession of the chattel at the time of the conversion." [124 S.C. 415, 117 S.E. 426.]

In First National Bank v. McCreary, supra, the Supreme Court of Oregon states the applicable law as follows:

"* * * Jones on Chattel Mortgages (5th Ed.) § 510, states the rule thus: 'A right of action for an injury to the property or to the mortgagee's rights does not pass by his assignment of the mortgage. Thus, an assignee cannot sue for a conversion of property which has taken place before the execution of the assignment. The assignment passes all the mortgagee's right to the property, but does not pass his right to sue for a conversion of the property, or for injuries to it, while he was the legal owner of it.' * * * We hold this to be the law; therefore McCreary cannot recover against the plaintiff, and the action at law for a conversion of the property cannot be maintained." [66 Or. 484, 132 P. 719.]

What is said by the Supreme Court of Arkansas in Wasson v. Taylor, supra, is in principle applicable here. It is there said [191 Ark. 659, 87 S.W.2d 65]:

"Only those rights are passed by assignment that are incident thereto, and all other rights, not regarded as incidental to the assignment, must be specifically mentioned to pass to the assignee. Here the assignment of the notes and mortgage to Reyburn carried with it all the rights the assignees had against the Scotts by virtue thereof. The right to sue the Union Trust Company for a neglect of duty in connection with the handling of the notes and mortgage was a personal right to appellees and was in no manner connected with any action against the Scotts to foreclose the land covered by the mortgage."

As plaintiff did not, by the transfer of the note and mortgage to it, acquire the right to maintain the tort action for conversion of the mortgaged property, it

was not the real party in interest and for that reason was not entitled to recover.

 Quite aside from this, however, it is to be observed that the court found that the mortgagee consented to the sale of the mortgaged property, thus waiving its mortgage lien, and for that reason neither it nor its assignee could maintain an action for its conversion. If this finding is sustained by substantial evidence the mortgage lien was released. Vaughan v. Hinkle, 131 Ark. 197, 198 S.W. 705; Williamson v. Lesser-Goldman Cotton Co., 169 Ark. 1212, 277 S.W. 347; May Way Mills, Inc. v. Jerpe Dairy Products Corp., 202 Ark. 397, 150 S.W.2d 615; Moffett Bros. & Andrews Commission Co. v. Kent, Mo., 5 S.W.2d 395; Fincher v. Bennett, 94 Ark. 165, 126 S.W. 392; First National Bank & Trust Co. v. Stock Yards Loan Co., 8 Cir., 65 F.2d 226. In Fincher v. Bennett, supra, the Supreme Court of Arkansas announced the rule which prevails in that jurisdiction as follows [94 Ark. 165, 126 S.W. 393]:

"* * * where the mortgagee authorizes or gives consent to the mortgagor to sell the mortgaged property, the mortgage lien thereon is discharged."

 The finding is presumptively correct and an examination of the record convinces that it is abundantly sustained by the evidence.

 It is, however, argued by plaintiff that the consent to the sale by the mortgagee was conditioned on the mortgagor paying over the proceeds received from the sale for credit upon the mortgage debt. However, the failure of the mortgagor to pay over the proceeds of the sale to the mortgagee for credit upon the mortgage debt did not prevent an effective release of the lien of the mortgage as against a third person who was not a party to and did not have knowledge of that understanding. There is no evidence indicating that defendant had any knowledge of such understanding. First National Bank & Trust Co. v. Stock Yards Loan Co., supra; Moffett Bros. & Andrews Commission Co. v. Kent, supra; 14 C.J.S., Chattel Mortgages, § 262, p. 876. In First National Bank & Trust Co. v. Stock Yards Loan Co., supra, we said [65 F.2d 229]:

"The law applicable to such a state of facts is well settled. When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives his lien, and this is true whether the purchaser knew of the existence of the chattel mortgage or not."

It is argued that defendant was not in a position to rely on the defense that the mortgagee had waived its lien because defendant had not in its answer affirmatively pleaded such waiver. Testimony as to the practice between the mortgagor and mortgagee with reference to the right of the mortgagor to sell the mortgaged property was admitted without objection and abundantly establishes that the mortgagor in this case had "blanket" authority to sell the mortgaged property to any buyer he saw fit. The record in this regard clearly reflects that the mortgagor was authorized to sell the mortgaged property. To be sure, it was expected he would account for the proceeds to the mortgagee. The general manager of the mortgagee testified, among other things, as follows:

"* * * All the growers had the privilege of selling their own broilers to anyone that they saw fit, for any price they saw fit, without saying anything to us about it. They just have the blanket consent to do such, insofar as the older and trusted growers are concerned. Mr. Watson is one of the older and trusted growers."

 There was other testimony to like effect all coming from witnesses for the plaintiff and all being admitted without objection. When issues, though not raised by the pleadings, are tried by express or implied consent of the parties they are to be treated in all respects as

if they had been raised in the pleadings. Rule 15(b), Fed.Rules Civ.Proc., 28 U.S.C.A.; Vogrin v. Hedstrom, 8 Cir., 220 F.2d 863; McAllister v. Sloan, 8 Cir., 81 F.2d 707; Schmidt v. United States, 8 Cir., 63 F.2d 390. In Vogrin v. Hedstrom, supra, answering a contention that an affirmative defense had not been pleaded, and hence, could not be relied upon as a defense, we said [220 F.2d 866]:

" * * * Where an issue has in fact been tried even though not made an issue under the pleadings, yet in support of the judgment entered, the pleadings will be presumed to have been amended to conform to the proof."

It is urged that the finding by the court that the mortgagor sold his chickens to Glover as an independent contractor and not as agent for defendant, is not sustained by the evidence. In view of what we have already said as to the waiver of the mortgage lien it becomes immaterial as to whom the sale was made, and we pretermit any discussion of the question at this time. The judgment finding in favor of defendant in Farm Bureau Cooperative Mill & Supply, Inc. v. Blue Star Foods, Inc. is therefore affirmed.

■ Ottis Watson, plaintiff in Ottis Watson v. Blue Star Foods, Inc., was the owner and mortgagor of the chickens forming the subject of this controversy. He sues the defendant to recover the purchase price of the chickens, while Farm Bureau Cooperative Mill & Supply, Inc. sues defendant to recover for a conversion of the chickens. So far as the defendant is concerned it has paid the full contract price for the chickens, so that if plaintiffs in these cases should prevail, the defendant will have been held for three times the value of the chickens which it received in a good faith transaction, so far as it was concerned. The court found that plaintiff sold his chickens to Lester N. Glover and apparently plaintiff thought he sold his chickens to Glover, as he so alleges in his complaint, and he received from Glover checks representing the full purchase price of the chickens. It was not until after payment of these checks had been refused that plaintiff made any claim that in purchasing the chickens from plaintiff Glover was acting as agent for defendant. This seems to have been an afterthought. The court found that Glover was an independent contractor and that the chickens had been sold to him as such. This finding is assailed as not being sustained by substantial evidence. It is presumptively correct and on appeal should be sustained unless clearly erroneous. Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A.

Glover, in his transactions with plaintiff never at any time represented that he was acting as agent for defendant. It appears without dispute that Glover had been doing business at Cave Springs, Arkansas since 1930, that his business was going around in Arkansas buying chickens and reselling them to processors and that he used three trucks in his business and had ten men regularly employed therein at the time of his first contact with Watson. Going to the question as to the relation between Glover and defendant, a short contract was introduced in evidence which reads as follows:

"Whereas, First Party is engaged in processing poultry at Anderson, Missouri and is interested in securing live poultry in the vicinity of its plant, and

"Whereas, Second Party, is the owner of the following described vehicles, and is desirous of hauling live poultry in said truck to First Party's Plant.

\* \* \* \* \*

"Now Therefore, First Party agrees to pay and Second Party agrees to accept the sum of one-half (½) cents per pound of live poultry delivered at First Party's door in Anderson, Missouri for the use of the truck or trucks hauling said poultry and the further sum of one-fourth (¼) cents per pound of live poultry at First Party's door in Anderson, Missouri in payment

of services rendered either for Second Party or anyone hired by him.

"This Contract and Agreement may be terminated by either party upon twenty-four hour notice.

"Dated at Anderson, Missouri this 1st day of May, 1954."

■■ Glover testified that when he entered into the contract with defendant, he was given authority to draw drafts on defendant for chickens bought for its account; that defendant's manager at Anderson would call and tell him how many loads of chickens defendant could use and what price it would pay, and if he could produce chickens at the stated price he would receive pay in accordance with the contract, but if not, he got nothing and there were times when he was unable to buy at the fixed price and got no compensation; that the contract guaranteed him a profit if he could buy at the price fixed; that he sent his own men out on his own trucks and he was given no instructions as to where to go, how to load, what route to follow, or anything else; that the only instruction given him by defendant's manager was that defendant could use a certain number of loads of chickens at a given price and that his trucks were also being used for other purposes at the time Watson's chickens were picked up. The contract was signed by the parties in Missouri, and hence, is governed by the law of that state. It does not purport to authorize Glover to act as defendant's agent. No right of control by defendant was reserved in the contract or exercised in the performance thereof over the manner, methods or means by which Glover would acquire and deliver chickens to defendant, nor did it require personal services by Glover, but he was free to perform personally or through his own agents and at his own pleasure as to time, and no definite hours of labor or service were required. It simply compensated Glover for the use of his trucks and services when he could buy chickens for defendant at the price fixed by defendant. These factors and conditions, we think, indicated that Glover was, under the law

of Missouri, an independent contractor and not an agent of defendant. Skidmore v. Haggard, 341 Mo. 837, 110 S.W. 2d 726; Mabry v. Swift & Co., Mo.App., 145 S.W.2d 163; Coul v. George B. Peck Dry Goods Co., 326 Mo. 870, 32 S.W.2d 758; United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. In Skidmore v. Haggard, supra, the Supreme Court of Missouri points out the distinction between an independent contractor and an employee or agent. It is there said:

"In comment (Restatement of Agency, § 220, p. 485), it is said that 'the important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results'; that 'those rendering service but retaining control over the manner of doing it are not servants'; and that 'an agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency (even if he is 'subject to the fiduciary duties of loyalty and obedience to the wishes of the principal' by 'agreeing only to use care and skill to accomplish a result') is in a similar relation to the principal as to such conduct (his physical conduct) in its performance as one who agrees only to accomplish mere physical results.'" [341 Mo. 837, 110 S.W.2d 730.]

In Mabry v. Swift & Co., supra, the court held that the alleged agent was in fact an independent contractor because [145 S.W.2d 166]:

"The contract, on its face, disclosed no intention that Wyatt (the alleged agent) should be under the direction or control of the defendant as to the means or method used in producing the results contemplated by the contract." (Parentheses supplied.)

As has been observed, defendant paid for the chickens delivered to it by Glover.

This payment was effected by sight drafts drawn by Glover on the defendant and made payable to the plaintiff which, however, plaintiff endorsed in blank, and the possession of these was secured by an employee of Glover and, because of the plaintiff's endorsement, were cashed by Glover and placed to his personal account. Glover was not present when any of plaintiff's chickens were picked up but a Mr. Jones, an employee of Glover, secured plaintiff's endorsements on these drafts at the time he got each load of chickens. These transactions all occurred in the state of Arkansas. Jones was unknown to the defendant but was Glover's bookkeeper and office boy. Defendant did not participate in the transactions by which plaintiff's endorsements of these sight drafts were procured and certainly did not profit thereby and its good faith is not impugned in any manner.

 If, however, for the sake of argument it be conceded that Glover acted as defendant's agent in the purchase of these chickens, defendant could not, under the circumstances disclosed by the record, be held for the fraud perpetrated by Glover. The proceeds of these drafts were deposited to Glover's personal credit, used by him in the operation of his business, and no part thereof went to defendant. If Glover were acting as defendant's agent, still it could not be held that the committing of a fraud for his own personal benefit was within the scope of his agency. Thomson-Houston Electric Co. v. Capitol Electric Co., 6 Cir., 65 F. 341; McVeigh v. McGurren, 7 Cir., 117 F.2d 672; Friedlander v. Texas & Pacific R. Co., 130 U.S. 416, 9 S.Ct. 570, 32 L.Ed. 991; Brooks v. Gray-Von Allmen Sanitary Milk Co., 211 Ky. 462, 277 S.W. 816, 46 A.L.R. 1207; Mesce v. Automobile Ass'n of New Jersey, 8 N.J. Super. 130, 73 A.2d 586. In Thomson-Houston Electric Co. v. Capitol Electric Co., supra, the applicable law is succinctly stated in an opinion by Judge Taft as follows:

"The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, * * *." [65 F. 343.]

In McVeigh v. McGurren, supra, the rule is thus stated:

"No one can give to another any lawful authority to practice wilful fraud upon a third person. An agent, therefore, who intentionally defrauds a third person is personally liable for the injury he inflicts. The principal may or may not be liable also accordingly as he may or may not be deemed to have approved or participated in the wrongful acts." [117 F.2d 678.]

 There is here no claim and no evidence indicating in the slightest degree that the defendant approved or participated in the fraud.

It was no part of Glover's duty to secure, fraudulently or otherwise, plaintiff's endorsements on these sight drafts. That was done solely for the benefit of Glover, and in committing this fraud for his own benefit he was not acting within the scope of any authority he may have derived from the defendant.

 If we assume, as we think we must, that plaintiff and defendant were equally innocent of the fraud then the rule that, where one of two innocent parties must suffer the consequences of the fraud of a third party, he who made the fraud possible must bear the loss, is applicable. Plaintiff actually endorsed these five sight drafts without ever looking to see what they were. True, he testified that he did not know that the instruments on which he placed his signature were sight drafts, but he could readily have ascertained that they were sight drafts and his failure to do so was negligence on his part. As the defendant did not participate nor have any knowledge of the perpetration of the fraud, it should not suffer by reason of the negligence of the plaintiff in affixing his endorsements to these sight drafts. Hardy v. Ouachita National Bank, 165 Ark. 532, 265 S.W. 74; O'Berg

v. Bank of Sulphur Springs, 183 Ark. 622, 37 S.W.2d 700; Arkansas Power & Light Co. v. Bauer-Pogue & Co., 194 Ark. 1002, 110 S.W.2d 529. In Hardy v. Ouachita National Bank, supra, the Supreme Court of Arkansas had before it a case in which an endorsement on a note had been fraudulently secured. In the course of the opinion it is said [165 Ark. 532, 265 S.W. 75]:

"There is nothing in the record tending to show that any of the officers of the bank had anything whatever to do with procuring the indorsement of Hardy to the note. As far as the bank is concerned, Hardy signed the note as an indorser and is liable on his indorsement under the authorities cited above. He cannot be relieved from liability because of any fraud practiced by Smith in procuring his indorsement, unless such fraud was known to the bank before it accepted the note containing the indorsement, or that the bank in some way participated in the fraud. Hardy, by carelessly indorsing the note, put it in the power of Smith to deliver the note to the bank and thereby secure an extension of his existing indebtedness. The rule is, that, where one of two innocent persons must suffer the consequence of the fraud of a third person, he must bear the loss because he put it in the power of the third person to perpetrate the fraud."

In O'Berg v. Bank of Sulphur Springs, supra, the doctrine of equitable estoppel is reaffirmed by the Supreme Court of Arkansas. It is there said [183 Ark. 622, 37 S.W.2d 701]:

"This court is committed to the doctrine that, 'where two parties to a fraudulent transaction are equally innocent, and the loss must fall upon one, it should fall upon the one who, in law, most facilitated the fraud.' * * *

"Appellants, by an act of negligence on their part placed it within the power of Armstrong to dispose of the property to a third party under the belief that the mortgage was satisfied. They did this without compulsion, and their neglect in obtaining a return of the release deed brings the case clearly within the rule announced above."

In the circumstances disclosed by this record, under the doctrine of equitable estoppel the plaintiff, and not the defendant, should bear the loss resulting from his negligence.

We conclude therefore that the judgment appealed from, which was in favor of the defendant in both of these cases, was correct and is therefore affirmed.