Victor ODDO, d.b.a. Oddo's Food Center,
Appellant,

v.

INTERSTATE BAKERIES, INC.,
Appellee.

No. 16235.

United States Court of Appeals
Eighth Circuit.

Nov. 19, 1959.

Opinion Modified On Rehearing
Dec. 29, 1959.

See 271 F.2d 959.

William Harrison Norton, North Kansas City, Mo., and S. Preston Williams, North Kansas City, Mo. (Wilbur L. Pollard, Kansas City, Mo., and Williams & Norton, North Kansas City, Mo., on the brief), for appellant.

John Murphy, Kansas City, Mo. (J. Gordon Siddens, and Tucker, Murphy, Wilson & Siddens, Kansas City, Mo., on the brief), for appellee.

Before WOODROUGH, VAN OOSTERHOUT and MATTHES, Circuit Judges.

WOODROUGH, Circuit Judge.

This action was begun March 6, 1957 in the Circuit Court of Jackson County, Missouri, and removed to the federal court for diversity of citizenship. It was alleged in the complaint that:

The plaintiff owned and operated a grocery business at 1031 Burlington Avenue near the North end of the A.S.B. bridge in North Kansas City, Missouri, known as Oddo's Food Center, and was a customer purchasing bread from defendant Interstate Bakeries, Inc., for resale in the store from the time the store was opened in August, 1950. From that time until October, 1956, one Herbert W. Cooley (originally named a defendant but never served) was employed by the defendant bakery company as its route man who handled the sale and delivery of its bread and bakery products to the plaintiff and in the course of the business and while acting within the scope of his employment said Cooley made deliveries of bread and bakery products and left a carbon copy of the delivery tickets with plaintiff showing the quantity and price of the bread and bakery products so delivered to the plaintiff at the store and said Cooley took the original of said delivery tickets to the office of defendant and at the end of each month the defendant rendered a statement of account showing the total due from the plaintiff to the defendant based on the delivery tickets. Beginning on or about August 1, 1950, said Cooley began to falsify the delivery tickets delivered to the plaintiff and this course of conduct continued from August 1, 1950, through August 8, 1956. During all of the time Cooley falsified the delivery tickets in such a manner as to show greater quantities of defendant's goods delivered to plaintiff than were actually delivered and the defendant rendered an account and statement based on said falsified delivery tickets to the plaintiff at the end of each month and received payment from plaintiff for the amounts of the statement including the overcharges of bread and bakery products purportedly delivered.

The complaint then set forth the amount of the overcharge in each year, 1950 through 1956, totalling $79,840. Though demand was made on defendant for payment to plaintiff of the overcharges payment was refused.

It was alleged that knowledge that Cooley was falsifying the figures on the delivery tickets first came to plaintiff on or about October 8, 1956, although plain-

tiff had diligently and carefully checked the deliveries made by defendant. Judgment was prayed for the amounts of overcharges paid by plaintiff together with interest and costs.

Defendant joined issues by denials and special pleas and trial was had to the court without jury. Judgment was for defendant dismissing the action at plaintiff's costs in accord with a memorandum opinion (unpublished) which included the findings and conclusions of the court. The plaintiff appeals.

It appears without dispute that plaintiff was a customer of the defendant bakery company, buying its bread and bakery products over the period referred to in the complaint. Herbert W. Cooley was employed as the company's "driver-salesman" and before plaintiff opened his new store in 1950 the "driver-salesman" solicited plaintiff to buy defendant's bread and bakery products and to let them be placed in the new store for resale in the "favored position" on the bread and bakery racks. Three other bakeries, American Bakeries, Holsum Bakeries and General Bakeries, were also soliciting and plaintiff decided to buy from all four, but he was offered $22.40 a week in bread by defendant's agent Cooley to let defendant have the best position on the bread rack for resale of its product. He accepted that offer, allotted the favored position to defendant, and received the agreed payment in defendant's bread until well along towards the end of the period involved when the same amount was paid each week by Cooley's personal check to plaintiff, delivered to a clerk in the store. Defendant used the best position for the bread it sold to plaintiff throughout the relevant period and more of its bread was sold in the store than that of the other three bakeries combined.

It also appeared and the court found that:

"Sometime during this period from 1950 on, Cooley devised a scheme by which he showed on the duplicate delivery slip the delivery of bakery products [to plaintiff] greatly in excess of the amount and quantity actually delivered. Apparently this was accomplished by making out the duplicate delivery slip for excessive amounts, complete with extensions of prices, before the deliveries were made. The original delivery slips were not made out until the deliveries were actually made, and were then made out in the correct amounts.

"At the time of the delivery the bread was checked in by Oddo's checker against the original delivery slip only, and after having done so, he signed the original and Cooley tore out the carbon copy which did not conform to the original, and placed it in a box which had been provided in the store for that purpose. After the checking, the evidence reveals that the originals were then changed to conform to the carbon copies.

"For example, if Cooley had made out a carbon copy indicating that 54 loaves of a certain type of bread were to be delivered, the original would show 4 loaves and later he changed the original by inserting a '5' in front of the 4, so that it conformed to the exact amount shown on the carbon copy. Seemingly, the extensions were not made on the original at the time of the delivery, but were made at the time the changes were made in the original. The original slips were then returned to the company and it was from these slips that the defendant made its charges and rendered its invoices and statements to Oddo each month.

"As the amount of the original delivery slips showing the delivery of products to Oddo was, after their change to correspond to the carbons, greatly in excess of the amount actually delivered, Cooley had to account to the bakery in some way for the amount of products he had been charged with. He did this by showing the difference as sales to cash customers. The amount of the dif-

ference between the values actually delivered to Oddo and the value as shown by the delivery ticket he retained for himself out of cash sales, thus balancing his daily account with the bakery.

"Plaintiff contends that although this practice continued for more than six years, neither party ever suspected any discrepancy until the Summer of 1956. Until that time Oddo gave very little attention to the details of his business. He states that he was about the store doing various things, but worked mostly on the night shift, the store being kept open until a late hour; that he had a young woman bookkeeper whose duty it was to check invoices and draw checks for the payment of bills, which checks were presented to him by her and he signed the checks without particular knowledge as to whether they were correct or not. The last few years of the period he employed a firm of accountants who picked up the information once a week, took care of his accounts and made out checks and presented them to him for his approval and signature.

"Oddo says he had a boy in the back of the store in the receiving department checking the products that were delivered; that he personally never checked any bakery products, nor did he know anything about it. The evidence does not indicate that Oddo or any person in the store ever checked the bakery products received against the duplicate delivery slip; they only saw the originals. After the transaction was over and the bakery products had been sold, it was not possible to determine from the slip whether or not the amount delivered and the delivery slip conformed.

"During the Summer of 1956, the A.S.B. bridge was resurfaced, and it became necessary to re-route traffic from Burlington Avenue, the street on which plaintiff's store is located.

This situation continued for a considerable period of time, and Oddo says his business fell off about 25%, causing him some concern; that it is a well known fact in the grocery business that the sale of bread and bakery products follow very closely the trend in the sale of other types of groceries; that he discovered upon examination of the books, that the purchases of bakery goods from the other three major bakeries followed almost exactly the downward trend of his business; whereas the purchases from Interstate remained practically the same.

"Even at that he did not suspect Cooley, for whom he expressed friendship. However, he did contact the defendant's manager and explained to him that he thought there was something wrong with the billing, and in response to that conversation, defendant's manager went to the Oddo store and an investigation followed. Cooley was questioned, and, as a result of it, was discharged for misconduct. Cooley left the state shortly thereafter, and never returned. * * *

"While plaintiff did a very large business, his books and records were largely confined to invoices and check books and a bank book. He did, however, have all of his delivery slips for the entire period beginning with the opening of his present store in 1950, but the defendant had its originals only for a period back to March, 1956. It was the practice of the defendant to destroy all such records after a certain period of time.

"Following the discharge of Cooley, the plaintiff continued to buy bakery products from the defendant and the same relative display position was continued as had existed while Cooley was delivering. The space consisted of approximately 60% of all the display area devoted to bakery products during all the

period of time in controversy until the bringing of this lawsuit.

"Cooley left at the end of October, 1956, and from that date through June, 1957, a period of eight months, Oddo purchased 51.96% of his bakery products from the defendant.

"After this suit was brought, defendant produced its original delivery slips and the plaintiff's accountant compared the duplicates with the originals. By means of photography the slips were greatly enlarged, and they clearly reveal by such comparison that many of them were altered, as heretofore described.

"The evidence shows that of 400 such exhibits examined, 200 of them bore conclusive evidence of having been altered. This was revealed by the fact that the originals and duplicates did not correspond, the figures in many instances on the originals and the duplicates not being in the same relative position, both as to the quantity of product delivered and the amount extended in the price column.

"This comparison was made over a period of eight months, including March through October, 1956, and the evidence reveals that during that period, taking into consideration the changes made in the original delivery slips, the plaintiff had purchased 53.63% of his bakery products from the defendant, and 46.37% from other bakeries. Analysis of the Oddo account of all purchases of bakery products, including August, 1950 through February, 1956 (that is the period when the actual comparisons were made), reveals that the amount paid to the defendant was 68.6% of all bakery products purchased.

"During this period the plaintiff paid to the defendant the sum of $130,659.60 and he paid to the other three bakeries combined, the sum of $57,980.20.

\* \* \* \* \* \*

"There is no contention on the part of plaintiff that defendant received any part of the amount obtained by Cooley [from sales of the quantity of bread he falsely reported sold to plaintiff],[1] or that it had any actual knowledge that such practice was being carried on. During the whole period neither party made any check of the account or seemed to have any suspicion that any irregularities in the transactions existed. The account was handled by each party in the same manner as other accounts were handled and processed. When the delivery tickets were turned in by Cooley, the amounts shown thereon were charged to Oddo's account, and the monthly invoices were submitted to him, which he paid in accordance with their credit understanding.

"It is plaintiff's contention that he actually received 53.63% of all his bakery purchases during the entire period from defendant, whereas his payments to defendant during the entire period amounted to 68.6% of all payments made for bakery products, and therefore, that the difference between these two percentages represents the amount by which he was overcharged and is the amount he is entitled to recover from defendant."

■ It thus appears that the district court was convinced and found from the evidence that the defendant had from month to month throughout the period involved sent the plaintiff false statements of account in which plaintiff was charged for amounts of bread and bakery products "greatly in excess of the amounts actually delivered" to him and that "the conclusion is inescapable that because of Cooley's fraud plaintiff paid for large quantities of bread and other

---

1. Bracketed matter interpolated for clarity.

bakery products which he did not receive." The evidence fully supports these conclusions and it is clear that defendant, though often requested, has kept plaintiff's money so received without consideration and has refused to pay it back in whole or in part.

As one of the grounds for the refusal defendant pleaded in its answer that it was contrary to defendant's policy as plaintiff well knew to pay store owners any compensation for according it a "first position" for resale of its products in their stores and that plaintiff's conduct in contracting to charge and in receiving $22.40 a week from defendant's agent Cooley in payment of the defendant's use of the favored position was wrongful and was wrongfully concealed and contributed to the success of Cooley's fraud. The argument is expanded and relied on to justify defendant in keeping the plaintiff's money even if defendant did obtain it from plaintiff by overcharging him and without consideration.

Though the contention has been considered from the many angles presented, we have not found it to be meritorious. The evidence is that the only agent defendant sent to plaintiff to negotiate the sale of its product and the conditions of resale of it in the store and to carry out the delivery of it, making the proper mutual check and preserving the record on defendant's original and carbon copy forms, was Herbert W. Cooley. Obtaining a better or worse position was a necessary part of his job and so were arranging for the prices to be paid by plaintiff and a method of checking and recording quantities.

Obviously the space on the shelves belonged to plaintiff. It was in demand and valuable and he allotted it to defendant for the consideration of $22.40 a week. Defendant used the favored position to its advantage and the contract for compensating plaintiff was carried out.

There was no evidence that plaintiff was aware of any lack of authority to so contract on Cooley's part or guilty of any wrong-doing towards defendant in making and receiving the charge for defendant's use of this "first" or "favored" shelf position in his store. It was a charge he had a right to make. The court did not find plaintiff's conduct to be wrongful or rest decision against plaintiff upon its being wrongful. We do not find that plaintiff was guilty of any wrong toward defendant that would justify defendant's overcharging plaintiff for goods it did not deliver to him.

The defendant has not counterclaimed for the $22.40 per week and manifestly could not have recovered if it had done so.

But it did appear to the court that the fraud which the agent Cooley practiced in falsely recording and reporting the quantities of bakery products he delivered to plaintiff was the kind of fraud from which he alone profited and from which his employer did not benefit. It has been held as to such transactions in Yoars v. New Orleans Linen Supply Co., La.App., 185 So. 525; Brooks v. Gray-Von Allmen Sanitary Milk Co., 211 Ky. 462, 277 S.W. 816, 46 A.L.R. 1207, and Farm Bureau Co-op. Mill & Supply Co. v. Blue Star Foods, 8 Cir., 238 F.2d 326, 335, that the money the agent himself thus obtains wrongfully from a customer could not be recovered from the agent's principal. We do not express opinion as to such cases because it seems clear that the fraud Cooley practiced on plaintiff in this case was one from which defendant did directly receive a benefit. Here Cooley did not obtain any money or any goods from plaintiff by means of his fraud. It was the defendant that adopted Cooley's false reports to it and defendant wrongfully obtained plaintiff's money by the misrepresentations it made to the plaintiff and by overcharging him. After Cooley's transactions with plaintiff were complete and after he made up his false report for defendant, the defendant had the ownership of the same goods that it had before. It had the goods in the same hands to which it had confided them. The defendant suffered its loss when its agent Cooley made off with the proceeds of its goods. But that was a transaction with

which the plaintiff had nothing to do. There is no basis for connecting plaintiff with it and it affords no justification for defendant to retain plaintiff's money. Defendant has no right to say to plaintiff, "True, I overcharged you and obtained your money without consideration upon false representations of what you owed me, but I lost the same amount when my agent embezzled from me and therefore I will keep your money." There is no basis on which it can use that loss to offset what it owes the plaintiff for overcharging him.

It appears from the court's summarizing of conclusions that the decision to deny plaintiff any relief resulted largely from applying to the case the principle that where one of two equally innocent parties must suffer the consequences of the fraud of a third party he who made the fraud possible must bear the loss.

In respect to this principle, it appeared to the court that defendant was an "innocent" party as to the loss it suffered. That loss occurred, as pointed out, when its agent Cooley failed to account to it for the goods confided to him. But the evidence was that in the course of the business through the years defendant never required Cooley to present any record of what he did with any of the goods turned over to him to sell except as to the part he sold on credit. As to all the goods confided to him he was charged in gross when he went out in the morning and credited when he came back with the charges and the cash he brought in. If defendant had required signed delivery sheets and duplicate receipts in respect to all sales, the particular fraud Cooley practiced would have been more difficult for him.

On the other hand, the way Cooley's deceit was discovered was by laying the carbon copies of delivery sheets alongside the originals and using magnifying glasses and photographs. That was a testing for dishonesty and it is true plaintiff did carry on from day to day over the years without subjecting Cooley to any such tests for dishonesty. His checking was for mistakes and it appears to reflect ordinary care. When Cooley appeared at the store his deliveries of bread sold to plaintiff were counted and found to accord with his delivery slip and that slip was duly signed by plaintiff's authority and the bills that came to plaintiff to be paid were computed on the figures over plaintiff's authorized signature. In the absence of dishonesty that course would have given very reasonable assurance of correctness. There was no proof that it was an unusual and careless method on plaintiff's part.

But the case presents no occasion for consideration of or comparisons of negligence of either plaintiff or defendant. This action is for recovery of money which defendant obtained from plaintiff without consideration by defendant's false representation that it had delivered goods to the plaintiff at the cost prices and in the amounts shown in the defendant's billings, when in fact defendant had not made such deliveries. Plaintiff was deceived into believing the representation of the billings to be true by the willful fraud of the only agent of defendant that defendant sent to him to transact its business with him. That a principal is liable for the fraud of his agent committed in the very business in which the agent was appointed to act seems to be too elemental a proposition for serious discussion. As to the applicable law of Missouri, the Supreme Court said in State on Inf. of Taylor v. American Surety Co., 355 Mo. 1053, 200 S.W. 2d 1, loc. cit. 40:

> "A corporation is liable for a fraud perpetrated on a third person by its agent within the apparent scope of his authority or the course of his employment * * * despite the fact that the corporation did not authorize, concur in or know of the fraud." (Numerous citations are included in the opinion.) [2]

2. See also United States v. United States Cartridge Co., 8 Cir., 198 F.2d 456, 464.

Plaintiff's proof that defendant had caused him loss through the fraud of its agent for which defendant became liable was sufficient. Under the circumstances of discovery the statute of limitations was tolled. There was plainly error in the denial of all relief to plaintiff.

On the question of proof of damages, the court said:

"My first thought upon considering this case was that the defendant's theory was correct as to the uncertainty and speculativeness of the manner used by plaintiff to arrive at his damage, but, upon close analysis and study of all of the facts, it seems to me that it is very definite that Cooley's scheme was put into operation almost at the beginning of the period of delivery to the new store and continued throughout the whole time, and that if plaintiff is entitled to recover at all, the method adopted for proving his damages is not improper, but is based upon reasonable certainty.

\* \* \* \* \* \*

"Here we have three periods to compare. During the whole period of Cooley's agency, defendant's products occupied the favored display position, which constituted 60% of the entire bakery display area, and the other three bakeries together occupied 40%. During this entire period Oddo's records show that 68.6% of all payments made by him for bakery products were made to defendant. We have no direct evidence as to what extent Cooley 'padded' his deliveries during the first 5½ years of this period.

"However, during the last eight months of Cooley's agency, during which defendant's original delivery tickets were available for comparison with Oddo's carbons, 200 of the 400 tickets clearly reveal that 53.-63% of all the bakery products actually delivered to Oddo were supplied by the defendant, and 46.37%, or the remainder, was distributed among the other three principal bakeries.

His records reveal that for the same period he paid upon a ratio of 67.3% to defendant, and 32.7% to all others. Thus, the payments to defendant were within 1.3% of the average for the whole period of his agency.

"Since during this entire period the position of defendant's products on the display rack remained the same, and since it is known that during the last eight months of this period (March, 1956 to October, 1956) defendant delivered 53.63% of all bakery products purchased by plaintiff and collected 67.3% of all payments made by plaintiff for bakery products (this percentage being very close to the percentage for the entire period), the logical conclusion is that the percentage of actual deliveries during the period August, 1950 to February, 1956, was approximately the same as during the eight month period from March, 1956 to October, 1956, i. e., 53.63% whereas during the entire period plaintiff is known to have paid to defendant 68.3% of all payments for bakery products.

"The next and last period was that following October, 1956, after Cooley had left and while the accuracy of the quantities and amounts of bakery products delivered was not questioned. This period included November, 1956 through June, 1957. The relative display position of the products was the same, and Oddo paid upon a ratio of 51.96% to defendant, and 48.04% to all other bakeries.

"Facts may be established by circumstantial as well as positive evidence, if such circumstances are consistent with the fact sought to be established, and inconsistent with any other reasonable hypothesis."

It was and is contended for defendant that plaintiff's evidence of the amount of overcharges he was induced to pay (that is the amount of his damage) was too speculative and uncertain to support

a judgment in his favor but the general conclusion of the trial court to the contrary is not shown to be erroneous.

■■ The findings on the evidence covering the three periods when plaintiff was paying the bills presented to him by defendant reflect the court's close analysis and study of the facts in evidence and the correctness of the declaration that the facts could be established by circumstantial as well as by positive evidence is well settled by controlling authority. In this case the defendant has destroyed its own records covering a large part of the period involved, but the plaintiff has kept all of his delivery slips for bakery goods and his checks in payment; the accounts of the business in bakery goods were handled in the same manner as the other accounts; the position of the bakery goods display remained the same throughout and we are satisfied that the amount of plaintiff's damages can be arrived at with reasonable certainty from records of the business and other evidence that remain available. In the situation presented, it is not necessary that the proof of loss be made with mathematical exactness. It suffices that it be based upon reasonable certainty. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

■ Although the district court studied the evidence as to the amount of plaintiff's damage with care, it did not make adjudication of the amount in view of its decision to dismiss for lack of liability of defendant. Accordingly, we determine that the judgment of dismissal appealed from should be and is reversed. We hold that the plaintiff is entitled to recovery on his cause of action and direct that a new trial be awarded on the issue as to the amount of damages.

Reversed and remanded for new trial on the issue as to the amount of damages.